**SAKSAGANSKY v. WEEDIN, Immigration Com'r.**

**No. 6555.**

Circuit Court of Appeals, Ninth Circuit.

Oct. 19, 1931.

Clarence L. Gere and M. A. Zioncheck, both of Seattle, Wash., for appellant.

Anthony Savage, U. S. Atty., and Hamlet P. Dodd and Cameron Sherwood, Asst. U. S. Attys., all of Seattle, Wash. (John F. Dunton, U. S. Immigration Service, of Seattle, Wash., on the brief), for appellee.

Before WILBUR and SAWTELLE, Circuit Judges, and WEBSTER, District Judge.

SAWTELLE, Circuit Judge.

Appellant, Michael Saksagansky, was born in Ekaterinoslav, Russia, in 1908, of wealthy parents. In 1923 he resided with his mother in Constantinople for two months, and then came to this country on the steamer Madonna, arriving at Providence, R. I., on November 1, 1923. He lived in Hartford, Conn., for about two years and a half, then went to New York City, where he attended City College under the name of James M. Sacks.

Some time in November, 1930, Saksagansky went to Hartford for a short time, and then "hitch-hiked" across the country to the Pacific Coast, first to San Francisco, thence to Seattle in January, 1931. Since that time he has made an effort to find work, but was not successful, and he has received money from his mother in Hartford.

On February 9, 1931, while appellant was vsiting the German motorship Oakland in Seattle harbor, he was arrested by the Seattle police and an immigration officer, and imprisoned in the city jail. At that time he was questioned by the immigration authorities, and on the basis of his statements application was made to the Secretary of Labor for a warrant for his arrest, which warrant was duly issued on February 11, 1931.

**Upon** receipt of the warrant, appellant

was arrested by an immigration inspector, and further hearings were held on March 5 and March 30, 1931, at which time appellant was notified of the charges against him and had the benefit of counsel. After these hearings, the entire record was forwarded to the Secretary of Labor, and on April 25 Luther Weedin, commissioner of immigration for the port of Seattle, made application for a deportation warrant. This application said, among other things: "Deportation via Port of Seattle is recommended. It is believed that arrangements can be made to effect same through Shanghai with provision for rail transportation from that Port to Russian Territory."

On May 7, 1931, a warrant of deportation was issued by the Secretary of Labor, which specifically provided for deportation to Russia.

Appellant then filed a petition for a writ of habeas corpus in the United States District Court for the Western District of Washington, Northern Division. From the refusal of that court to issue the writ comes this appeal.

The warrant of arrest charges the appellant with having been found in the United States in violation of the Immigration Act of October 16, 1918, as amended by the act of June 5, 1920, in that he believes in, advises, advocates, or teaches the overthrow by force or violence of the government of the United States or of all forms of law. The pertinent section of the act, 8 USCA § 137, provides:

"That the following aliens shall be excluded from admission into the United States: * * * (c) Aliens who believe in, advise, advocate, or teach, or who are members of or affiliated with any organization, association, society, or group, that believes in, advises, advocates, or teaches: (1) the overthrow by force or violence of the Government of the United States or of all forms of law. * * *

"That any alien who, at any time after entering the United States, is found to have been at the time of entry, or to have become thereafter, a member of any one of the classes of aliens enumerated in section one [supra] of this act, shall upon the warrant of the Secretary of Labor, be taken into custody and deported in the manner provided in the immigration act of February fifth, nineteen hundred and seventeen. The provisions of this section shall be applicable to the classes of aliens mentioned in this act irrespective of the time of their entry into the United States."

■ As we have said so often, our power of review in cases of this character is extremely narrow.

"In order to successfully attack by judicial proceedings the conclusions and orders made upon such hearings [i. e. hearings of the immigration officers] it must be shown that the proceedings were manifestly unfair, that the action of the executive officers was such as to prevent a fair investigation, or that there was a manifest abuse of the discretion committed to them by the statute." Low Wah Suey v. Backus, 225 U. S. 460, 468, 32 S. Ct. 734, 735, 56 L. Ed. 1165, cited in Skeffington v. Katzeff (C. C. A. 1), 277 F. 129, 131.

There is no evidence in the record before us of any unfairness or arbitrariness on the part of the immigration officials who conducted the hearing. Prior to the issuance of the warrant of arrest by the Secretary of Labor, immigration officials examined appellant in the Seattle jail, and he was advised: "Mr. Saksagansky, I [Inspector Cornell] am an Immigrant Inspector in the service of the United States Government. At this time I wish to make some inquiries concerning your entry into the United States and your right to be and to remain in this country."

■ In the latter hearings, after the issuance of the warrant of arrest, appellant was represented by counsel, and we find no evidence of any arbitrariness on the part of the officials in charge of said hearings. The hearing was fair, and our support or rejection of the findings must hinge on the question of whether or not there was any evidence to support the findings and conclusions of the officials. If there was any such evidence and their finding that the appellant believed in the overthrow of the government of the United States by force was based on a conflict in the testimony, then we have no power to reverse same. "There is no judicial power to review or reverse a finding of fact based upon evidence." Skeffington v. Katzeff, supra.

After appellant had been questioned at various times regarding his beliefs he drew up the following document to make his position clear:

"Many questions have been asked me in such a way, that while freely answered, inferences have crept in that are not fair, and I want to make my position clear. When we came to this country, we knew that it had been established for the purpose of giving protection to the weak as well as the strong, and in order to do this, it was necessary to

overthrow a tyrannical government by a revolution. I have been charged with believing in, advising, advocating or teaching the overthrow by force or violence of the Government of the United States, or of all forms of law. That is not true. It is the abuse of privileges by which I chose to call capitalists, resulting in the thwarting of the will and liberty of the common people that I object to. This has frequently been called here, 'the Invisible Government.' I believe the Constitution of the United States provides for a government by the majority, but it is easy to see that those of great wealth have power to delay and defy the people in their efforts to secure equal protection for all. Men of wealth owned slaves, their property, but slavery was abolished. The working classes in many instances today are as much slaves to a system as the black man ever was. They are enslaved by the greed of great wealth. Of course when a man has acquired wealth, even tho he has stolen it, he will fight to keep it. These people have always fought aganst the Government operating or owning the things that belong to the people, but still this Government operates and owns public utilities. With the Constitution of the United States it should not be necessary for the working classes to suffer as they do. I am not an anarchist, but I am accused of being one because I believe the working classes should fight for their rights, if need be. I do not believe in the overthrow of this Government as such, but I do believe that the invisible government must be eliminated and the people actually allowed to govern themselves.

"I have been asked concerning certain books if I believed their teachings, but because I could not tell just what was meant I refused to answer. That is only fair. If I say that I believe that the old Russian government should be overthrown, that does not mean that I believe that a good government should be overthrown. As I understand it from Americans themselves they believe that good government is the heritage of every people, and that a bad and tyrannical government should not remain, and finallly, I want to again deny that there is any truth whatsoever in the charges made against me."

We think it is not necessary to consider the nature of the pamphlets—"Death Penalty Demand," "Class Struggles in America," "The Frameup System," by Verne Smith; "The State and Revolution," by Nicolai Lenin; "Southern Cotton Mills and Labor," by Myra Page; "The Dictatorship of the Proletariat," printed in Russian, with an English notation in front "Printed in Russia"; a copy of the "Communist Manifesto," etc.— that were found in appellant's possession when he was first arrested, and about which he was later interrogated. It is not clear to us whether they were introduced into evidence, nor whether they were considered by the immigration officials. We must rely upon the credo of the appellant quoted above and on the questions which he answered at the hearings. Some of the questions and answers were as follows:

"Q. Do you believe that the government should be ruled under the Dictatorship of the Proletariat? A. I do."

"Q. You also * * * believe that the holders of property, in the event it is confiscated, are quite apt to put up a struggle to prevent it [i. e. confiscation of their property by the state], are they not? A. There is a natural answer to that, yes.

"Q. Do you believe that if necessary this struggle should take place and confiscation actually happen to their property? Yes.

"Q. In the event these people, both in the United States and other countries refuse to give up their property, it will then be necessary to take it from them, will it not? A. Of course. * * *

"Q. Do you believe then that it will be necessary for the workers to take over the government in all countries? A. Eventually it will be so.

"Q. Besides taking over the functions of the government, what else will they have to take over?" The answer was to the effect that everything should be government owned, telephone, lights, railroads, post office, large automobile companies, large manufacturers of shoes, clothes, etc.

"Q. You actually are sincere in your belief that this form of government will take place? A. Yes.

"Q. You are also sincere in your belief that if it does take place a revolution will be necessary? A. Of course it is necessary.

"Q. Do you believe that this revolution will take place by force and violence? A. Not in all countries, not necessarily.

"Q. In the United States do you believe that this revolutionary change of government will be accomplished by force, and violence? A. It is very hard to tell. It is not so near yet.

"Q. You don't think that large property holders and individuals are going to give up their money and holdings peacefully do you?

A. They might bust the way things are going now.

"Q. Do you believe that this confiscation of property and the taking over of the government of the United States and in all countries should be accomplished by force and violence if no other means is sufficient? A. Yes."

 The immigration officials and the lower court evidently based their findings largely on this last question and answer. In the last analysis, appellant does there unequivocally assert that he believes in taking over the government of the United States by force, and that, taken in connection with the other evidence in the case, is sufficient to justify the finding of the immigration officers.

There were many questions that appellant refused to answer: "Do you believe in their teachings [i. e. the teachings of the Communist Party]"; "Do you believe in the present form of Russian Government"; "Do you believe in the overthrow of the present United States Government"; "Do you believe in the overthrow of all government with the exception of the Soviet form of government in Russia at the present time"; "Have you ever been given an opportunity to join the Communist party"; and "If given an opportunity would you do so"; etc. In a case of this nature, appellant's failure to answer these questions was important, and such failure could be considered by the immigration officers against him.

"Conduct which forms a basis for inference is evidence. Silence is often evidence of the most persuasive character. Runkle v. Burnham, 153 U. S. 216, 226, 14 S. Ct. 837, 38 L. Ed. 694; Kirby v. Tallmadge, 160 U. S. 379, 383, 16 S. Ct. 349, 40 L. Ed. 463. Compare Quock Ting v. United States, 140 U. S. 417, 420, 11 S. Ct. 733, 851, 35 L. Ed. 501." Bilokumsky v. Tod, 263 U. S. 149, 154, 44 S. Ct. 54, 56, 68 L. Ed. 221.

"There is no rule of law which prohibits officers charged with the administration of the immigration law from drawing an inference from the silence of one who is called upon to speak." Id., 263 U. S. 149, 154, 44 S. Ct. 54, 56, 68 L. Ed. 221. See, also, Vajtauer v. Commissioner of Immigration, 273 U. S. 103, 112, 113, 47 S. Ct. 302, 71 L. Ed. 560.

 The order of deportation is, then, valid, and we cannot interfere with the finding of the immigration officers. With regard to the actual warrant itself, however, a different situation arises. Section 20 of the Immigration Act of February 5, 1917 (8 USCA § 156), provides: "That the deportation of aliens provided for in this act shall, at the option of the Secretary of Labor, be to the country whence they came or to the foreign port at which such aliens embarked for the United States; or * * * if such aliens are held by the country from which they entered the United States not to be subjects or citizens of such country, and such country refuses to permit their reentry, or imposes any condition upon permitting reentry, then to the country of which such aliens are subjects or citizens, or to the country in which they resided prior to entering the country from which they entered the United States. * * *"

Appellant contends that it is the purpose of the immigration officers to deport him to Russia via Shanghai, and it appears from the record that suggestion was made that appellant be deported from the port of Seattle to "Shanghai with provision for rail transportation from that Port to Russian territory." The warrant of deportation itself provides that the alien be sent to "Russia, with the expenses of an attendant if necessary." The former course is not warranted by the fact or the law. To convey petitioner to China and there release or discharge him would in no sense satisfy the law, nor carry into effect the order of deportation. This court cannot sanction such a course, and we do not assume it will be pursued. The Secretary of Labor has found, and we think correctly so, that the petitioner should be deported to Russia. If, for any reason, this order cannot be carried into effect, then petitioner must be discharged from custody.

In the case of Petition of Brooks (Bonder v. Johnson) (D. C.) 5 F.(2d) 238, the government admitted that they had no power to deport the petitioner to Russia. However, under the record in the instant case, there is no such admission by the government, and we have already said that we sustain the finding of the immigration officials that petitioner is deportable.

Ordered, that the cause be remanded to the District Court, and, if for any reason the petitioner cannot be deported to Russia within thirty days thereafter, that the writ issue as prayed and the prisoner be released from custody.