**MORAITIS v. DELANY, Acting Director of Immigration.**

No. 1693.

District Court, D. Maryland.

Aug. 28, 1942.

Wilfred T. McQuaid, Joel J. Hochman, and Max L. Berman, all of Baltimore, Md., for plaintiff.

Bernard J. Flynn, U. S. Atty., and K. Thomas Everngam, Asst. U. S. Atty., both of Baltimore, Md., for director.

CHESNUT, District Judge.

This habeas corpus case presents a question of novelty arising in the administration of the Federal Alien Deportation Statute. The particular point is this. On June 24, 1942 the petitioner was arrested in Baltimore on a warrant charging that he was an alien subject to deportation. In accordance with due procedure he was given a hearing with the result that on August 8, 1942 a warrant was issued for his deportation to Greece. Because Greece has now been overrun and occupied by Germany, the petitioner contends that it is impossible to execute the warrant, and will continue to be impossible for an indefinite duration, and therefore he is entitled to be released from custody either absolutely, or at least upon giving bond for his appearance at such time in the future that the warrant can be executed. The respondent contends, however, that although the warrant cannot immediately be directly and exactly executed it can nevertheless be substantially executed by presently deporting the petitioner to England where the Greek Government is now functioning in exile, as recognized by the State Department of the United States; and in any event in view of the present difficulties in transportation resulting from the world-wide war, the petitioner is not now entitled to be released from custody either absolutely or on bail.

From the testimony taken at the hearing I make the following *findings of fact*.

The petitioner is a man 45 years of age of the Greek race who was born in Turkey, but moved with his family in 1914 to the Island of Chios in the Aegean Sea, under the government of Greece. He lived there continuously with his family until August 15, 1939 when he left to come to this country. He is married and has three minor children who remained in Chios until Greece was overrun and occupied by Germany, when they went as refugees to the Island of Cyprus, a British possession, and are there now.

The petitioner, Moraitis, signed on as a member of the crew of the Greek steamship "Aghios Nicholaos"; at the port of Huelva, Spain, on October 14, 1939. The ship arrived in Baltimore November 6, 1939. The official manifest filed here by the master of the ship (see 8 U.S.C.A. § 171) gave the following data with regard to the petitioner as a member of the crew. His name was given as Stamatios Hadjistamatis, 12 years service at sea, position in crew trimmer, engaged at Huelva, October 14, 1939, not to be paid off or discharged at port of arrival, able to read, age 42, male, race Greek, nationality Greek, height 5 feet 6 inches, weight 158 pounds. The official statement of the master of the vessel regarding change in the crew prior to departure filed at the port of Baltimore on June 27, 1940, from the port of Rosario, Argentine, stated that Stamatios Hadjistamatis was discharged (presumably at Baltimore). The petitioner testified that Hadjistamatis was his mother's maiden name and that the entries on the ship's manifest with regard to him were correct with the exception that he had not had 12 years service at sea but only three months, and that he was not engaged as a trimmer but as an ordinary seaman.

Moraitis had a brother and some cousins in Baltimore and received employment here by or through them in a restaurant and was so occupied from about the time of his arrival in November 1939 until he was arrested on June 24, 1942 on the warrant charging that he was subject to deportation for the reason that he was in the United States in violation of the Immigration Act of 1924, 8 U.S.C.A. § 201 et seq., in that he had remained in the United States for a longer time than permitted under said Act or the regulations made thereunder. The warrant contained the following notation: "The alien may be permitted to re-ship foreign without expense to the United States, such departure to be verified." Moraitis was given a hearing with opportunity to show cause why he should not be deported. The presiding Inspector who conducted the hearing found that the petitioner is an alien native of Turkey and subject of Greece who last entered the United States at Baltimore on November 6, 1939 on the Greek Steamship Aghios Nicholaos from Huelva, Spain, as a seaman, and was admitted for a period of 60 days and that he had overstayed that permissible period of time. His conclusion of law was that the alien was subject to deportation under sections 14 and 15 of the Immigration Act of 1924, 8 U.S.C.A. §§ 214, 215, and was deportable to Greece. He also found from the testimony that the alien had property in the United States consisting of $540 in a savings account and $300 in Defense Bonds; and that he was apparently of good moral character, and had registered under the alien and selective service registration acts. He proposed an order that the alien be deported to Greece at government expense, on the charge stated in the warrant of arrest. He further recommended that the alien be permitted to depart from the United States or re-ship foreign without expense to the government of any country of his choice immediately under safeguards, such departure to be verified and considered as satisfactory compliance with the terms of the warrant. The respondent in this case, J. F. Delany, acting as District Director of the Baltimore District, concurred in the presiding Inspector's proposed findings, conclusions and order. The file in the case was duly transmitted to Philadelphia and after reviewing it Herman R. Landon, Acting Chief Warrant and Deportation Branch (of the Department of Justice) approved the findings and conclusions, and under date of August 8, 1942, the warrant was issued for the deportation of the alien to Greece.

Both at the Departmental hearing and at the hearing in court here, Moraitis testified that he had had only three months service as a seaman, and that he found he was not able to follow the sea as he was seasick or otherwise incapacitated by that service, and for that reason was unwilling to re-ship foreign. That he had not been a seaman for any long period was corroborated by two relatives residing in Baltimore on the basis of general family information. One witness had visited Moraitis in Chios in 1930 and found that he was then conduct-

ing a store. The weight of the testimony in this respect is that he is not in fact an experienced seaman, and a fair inference from the testimony as a whole is that he came to this country as a member of the crew of the steamship for the purpose of entering the country and staying here if possible, although he testified that he did not form the intention of staying here until he had "walked off the ship" and remained here some time, and that nobody told him he could remain only 60 days. He states that he was an infantry lieutenant in the Greek Army in 1914 and that he is willing to enter the military service of the United States (and thereby under recent legislation become a naturalized citizen). He appears to be in ordinary good health. The evidence justifies the view that the alien's unwillingness to re-ship foreign and his resistance to deportation is primarily motivated by his desire to stay in this country and accumulate money for the partial support of his relatives in Cyprus.

The petition for habeas corpus was filed in this court on August 12, 1942, before the receipt in Baltimore of the formal warrant of deportation and without knowledge on the part of the petitioner that it had been previously issued. The petitioner, therefore, only asked that he should be discharged from further custody upon his furnishing bond in accordance with the provision of section 20 of the Immigration Act of 1917, 8 U.S.C.A. § 156. The respondent's answer filed August 14, 1942, recited the issuance of the warrant of deportation, denied that the petitioner was entitled to be released either generally or on bail, and neither admitted nor denied "German occupation of relator's home [Island of Kipros (Cyprus)] because of lack of information and knowledge. It is averred, however, that deportation is about to be accomplished and that such deportation seems to be possible in care of the Free Government of Greece presently in exile in England." It was, however, stipulated here in court at the hearing that it is not practicable or reasonably possible at this time to deport the alien directly to Greece and that if the petition for habeas corpus is dismissed, the government will transfer the alien to Ellis Island to await the first practicable opportunity to deport him to England. There was offered in evidence the official certificate of the Secretary of State "that the Government of the United States recog-

nizes the Greek Government now functioning in England as the Government of Greece." Now that the warrant has been issued the petitioner contends that he should be discharged because the warrant cannot be executed.

In the past there has been lax enforcement of the immigration laws regarding foreign seamen who enter and remain in this country more than the permissible 60 days. On account of present war conditions this has caused many foreign seamen to desert their ships, as they desire to remain in this country permanently if possible, or at least until they can re-ship on American or Panamanian ships at higher wages and better conditions. The result has been to seriously diminish the number of seamen available to man foreign ships and thus to cause delays in their sailing, to the serious prejudice of the whole war effort of the Allied Nations. But in the last few months the stricter enforcement of our immigration laws by arrests, confinement and deportation of deserting foreign seamen, and co-operative measures of the Allied Nations in pooling their manpower of seamen and increasing wages, has bettered the conditions.

### Conclusion of Law.

The petitioner may not lawfully be now deported to England; but is not now entitled to be released from custody.

### Opinion.

As the case is an important one without prior precedent, and will very likely be appealed, the facts have been stated in more detail than probably is necessary for the decision of the particular questions presented. The government contends that it is now entitled to deport the alien to England *as the first step* in his ultimate deportation to Greece. The argument is that when deported to England the alien will then become subject to the government to which he owes allegiance, and that there is an understanding and agreement between this country and the British Government in co-operation with other allied countries, including Greece, that seamen deported from this country to England will ultimately be deported to the "countries whence they came" to the United States. It is also pointed out that the governments of seven of the Allied countries engaged in war against Germany, Italy and Japan are now functioning in exile

in England and as such have been recognized by our State Department. See Guaranty Trust Co. v. United States, 304 U.S. 126, 58 S.Ct. 785, 82 L.Ed. 1224. All these countries, including Norway, The Netherlands, Belgium, part of France, Poland, Yugo-Slavia and Greece have been overrun and occupied by Germany. Many of the seamen deserting from ships in this country are citizens of these countries. It is recognized that shipping is a vital factor in the whole present war effort of the Allies and unless these foreign seamen deserting from ships here can be deported so that they will come within the jurisdiction of their governments, there will be a serious depletion in the number of seamen available for foreign ships which are now coming in great numbers to our ports. Under these conditions it is argued that strict enforcement of our immigration laws with regard to deserting seamen is of vital importance to the welfare and even safety of our country and that the most liberal interpretation of our deportation statutes is absolutely necessary to the national welfare. It is also suggested that when the alien is delivered to his own government any international obligation of this country would be discharged.

The argument is attractive and appeals to me strongly, but it is nevertheless necessary to critically examine the applicable statute to see if the intended action is legally permissible. The statute applies to all deportable aliens and not to deserting seamen only or particularly. It will not be contended that the present emergency, however great, will justify our courts in disregarding statutory enactments even when most liberally construed in the light of existing conditions.

 It is admitted that the alien in this case has been found in this country in violation of our immigration laws and regulations (8 U.S.C.A. §§ 166, 214, 222; Philippides v. Day, 283 U.S. 48, 51 S.Ct. 358, 75 L.Ed. 833), and that he is therefore liable to deportation, and properly should be deported to Greece as specified in the warrant. The only questions are whether he may now lawfully be deported to England as intended by the government, and if not, whether he is entitled to be discharged from custody. The controlling statute as to place of deportation is 8 U.S.C.A. § 156. This provides in part as follows: "The deportation of aliens provided for in this chapter shall, at the option of the Attorney General, be to the *country whence they came* or to the foreign port at which such aliens embarked for the United States; * * *." (Italics supplied.) There are then provided various alternatives for deportation to other countries on certain conditions or contingencies, none of which, however, are applicable to the present case. It will be noted that under the facts here the Attorney General had the option to deport the alien to Greece whence he came, or to Spain where he embarked. The official option was exercised in favor of Greece, because, it is suggested, Spain would probably not be willing to receive the alien.

The phrase in the statute "country whence they came" has been construed and applied by the Supreme Court of the United States and other federal courts in a large number of deportation cases. In Mensevich v. Tod, 264 U.S. 134, 44 S.Ct. 282, 283, 68 L.Ed. 591, it was said by Mr. Justice Brandeis—"The term 'country' is used in section 20 [of the Immigration Act of 1917—now 8 U.S.C.A. § 156, supra] to designate, in general terms, the state which, at the time of deportation, includes the place from which the alien came. Whether territory occupied and administered by a country, but not officially recognized as being a part of it, is to be deemed a part for the purposes of this section, we have no occasion to consider." In that case the alien came in 1911 from Grodno, then a part of Russia, but at the time of deportation in 1924 Grodno had become a part of Poland as officially recognized by the United States; and it was held that the alien could properly be deported to Poland, it being further said: "The validity of a detention questioned by a petition for habeas corpus is to be determined by the condition existing at the time of the final decision thereon. Stallings v. Splain, 253 U.S. 339, 343, 40 S.Ct. 537, 64 L.Ed. 940. Deportation to Poland is now legal." In United States ex rel. Mazur v. Commissioner, 2 Cir., 101 F.2d 707, 709, the phrase "the country whence they came" was again construed as follows: "These words have been interpreted to mean the country of the alien's nativity if it does not appear that he had acquired a domicile elsewhere". In that case the alien had originally come from Poland but had resided for eleven years in Cuba and apparently acquired a domicile there. It

was held that deportation to Poland as provided in the warrant was not lawful, but that deportation to Cuba would be proper. Nevertheless the alien was not discharged from custody pending an opportunity for official amendment of the warrant to provide for deportation to Cuba. In Caranica v. Nagle, 9 Cir., 28 F.2d 955, the alien had come to this country from Macedonia, then a part of Turkey, but at the time of deportation a part of the Greek Republic; and it was held that he could properly be deported to Greece. In United States ex rel. Mastoras v. McCandless, 3 Cir., 61 F.2d 366, the alien came from Albania, then a part of Greece, but at the time of deportation Albania was a separate kingdom. It was held that he could properly be deported to Albania. In Wenglinsky v. Zurbrick, 6 Cir., 38 F.2d 985, 986, the alien had come from Odessa in Russia and here married her husband who had come from another part of Russia subsequently included in Poland. The district court and the Sixth Circuit held that deportation to Poland was proper, but the Supreme Court reversed. 282 U.S. 798, 51 S.Ct. 35, 75 L.Ed. 719. In Seif v. Nagle, 9 Cir., 14 F.2d 416, the alien had come from Galicia, then in Austria, but later, as the result of the first world war, a part of Poland. At first the warrant required deportation to Austria but was later amended to Poland, which was held proper by the court.

These illustrative cases very clearly show that the phrase "country whence they came" has been authoritatively construed to mean the country *territorially* rather than *governmentally*, from which the alien came. Burnet v. Chicago Portrait Co., 285 U.S. 1, 7, 52 S.Ct. 275, 76 L.Ed. 587. And this construction is in accord with the ordinary primary significance of the phrase as used in the statute. No case has been cited, and I have found none, which by the most liberal construction of the statutory phrase could authorize the deportation of an alien who came from a particular territory or place, to an entirely different country merely because the government of the place from which he came has been shifted to that other place. The purpose of the statute is to deport the alien to the place or country from which he came irrespective of the political sovereignty of that place at the time of deportation.

The government here contends that deportation to England would be only the first step toward the ultimate deportation to Greece. But the statute and the warrant impose the duty upon the federal officials to deport this alien to Greece, and it is apparent that if the alien is deported to England this government would then lose its official control over him. United States ex rel. Hudak v. Uhl, D.C., 20 F.Supp. 928, 930, affirmed, 2 Cir., 96 F.2d 1023. And indeed it is the announced purpose of the government, in adopting the proposed course of deportation, to put the alien within the control of the Greek Government now functioning in exile in England, with the expectation that he may be made available for maritime employment. It is further said that in England maritime courts have been established for the very purpose of dealing with foreign seamen thus deported to England, and that numerous such deportations have been accomplished in recent months, but all apparently without judicial contest in this country. While I am not impressed by the consideration that deportation to England would be intrinsic injustice to this particular alien, it is necessary here to consider whether the proposed deportation is in accordance with the Act of Congress. I have reluctantly concluded that it will not be. The ·deportation is not an extradition at the request of the Greek Government pursuant to a treaty, but an independent act of this Government which must be in accordance with the Act of Congress. In Saksagansky v. Weedin, 9 Cir., 53 F.2d 13, 16, an alien had come to this country from Russia. At the time of deportation he could not be properly sent to Russia by reason of the absence of recognition by the United States of the then Russian Government. The court said:

"Appellant [the alien] contends that it is the purpose of the immigration officers to deport him to Russia via Shanghai, and it appears from the record that suggestion was made that appellant be deported from the Port of Seattle to 'Shanghai with provision for rail transportation from that Port to Russian territory.' The warrant of deportation itself provides that the alien be sent to 'Russia, with the expenses of an attendant if necessary.' The former course is not warranted by the fact or the law. To convey petitioner to China and there release or discharge him would

in no sense satisfy the law, nor carry into effect the order of deportation. This court cannot sanction such a course, and we do not assume it will be pursued."

However it does not follow that the petitioner is now entitled to be discharged from custody either absolutely or under bond conditioned for his surrender when deportation directly to Greece becomes possible. The petitioner contends that he must be now discharged because deportation to Greece is admittedly not possible under present conditions, nor shown to be likely soon changed. There are indeed a number of judicial decisions to the effect that where the government concedes the impossibility of presently executing the warrant of deportation, the petitioner should be discharged unless the warrant can be executed within a reasonable time which, in various cases, has been fixed at two to four months. Bonder v. Johnson, D.C.Mass., 5 F.2d 238; Ex parte Matthews, D.C.Wash., 277 F. 857; Saksagansky v. Weedin, 9 Cir., 53 F.2d 13; Caranica v. Nagle, 9 Cir., 28 F.2d 955, 957. But these cases were all decided in time of peace and under vastly different conditions from those now existing in the present world war. Certainly at present the government is clearly justified in a strict enforcement of its deportation laws to discourage the desertion of their ships by foreign seamen, which tends to create a condition so prejudicial to the interests of the United States, as graphically portrayed in the affidavit of Marshall E. Dimock, Director of Recruiting and Manning Organization, War Shipping Administration, referred to in the testimony in this case by Mr. Shaugnessy, Deputy Commissioner of Immigration. Counsel for the petitioner has objected to the admissibility of this affidavit on the familiar rule of hearsay; but it merely puts emphasis, in detail, on facts more or less within common knowledge and heretofore brought to the attention of this court in several litigated cases in the last few years. See, also, United States ex rel. Pappis v. Tomlinson, D.C., 45 F. Supp. 447, 448.

What constitutes a reasonable time for the detention of the petitioner in custody for deportation depends upon the facts and circumstances of particular cases. This court cannot shut its eyes to the vitally important interests of this country at this time with respect to the bottleneck of shipping, when every available ship, domestic and foreign, must be utilized to the utmost without delay consequent upon the lack of available seamen. Under these present conditions the court should be liberal indeed in aiding the executive branch of the government in the strict enforcement of laws so vitally necessary in the common defense. There is sound authority for this view in United States ex rel. Schlimm v. Howe, D.C.N.Y., 222 F. 96, 97, where Circuit Judge Lacombe refused to release an alien who had come here from Germany and was ordered deported in 1915 when, by reason of the then existing war between Germany and England, his deportation to Germany was not possible. It was said:

"At the present time there is no regular passenger ocean service to German ports, so the authorities are unable to forward him, and are holding him until some opportunity of returning him to Germany may present itself. His continual detention is unfortunate, but certainly is not illegal. His present condition can be alleviated only by the action of the executive branch of the government. A federal court would not be justified in discharging him."

This view was also approved by District Judge Westenhaver of Ohio, In re Kosopud, D.C., 272 F. 330, 334. In this respect the distinction between times of peace and war was clearly stated by Circuit Judge Hough for the Second Circuit in United States ex rel. Ross v. Wallis, 2 Cir., 279 F. 401, 403. The alien there was ordered deported to Scotland in 1922, but the government found difficulty in executing the warrant by reason of the refusal of Great Britain to issue the necessary passport. For the Court, it was said:

"This and every other deportation order requires the proper official to return the alien to 'the country whence he came,' and for that purpose 'to purchase transportation for the alien.' Under familiar law, this necessarily means that the transportation is to be obtained and the deportation effected within a reasonable time. What is a reasonable time varies with circumstances; during the World War it was a matter of even judicial cognizance that opportunities for deportation were rare and long delayed. We now take cognizance of the fact that peace has been

432

declared, and regular communication with the British Isles re-established, and we therefore express our opinion that unless this relator, or any other person similarly situated, be actually deported within four months after such alien has exhausted his legal remedies, any further or other detention under pretense of awaiting opportunity for deportation would amount, and will amount, to an unlawful imprisonment, from which relief may be afforded by a new habeas corpus."

■ It is unnecessary at this time to determine how long this alien can validly be kept in custody awaiting deportation to Greece. Very possibly the government may not have the opportunity to so deport him for much more than four months, and in view of existing conditions I am not disposed at the present time to think that a year would be too long to hold the alien in custody. His detention is not punishment for crime but incident to the strict enforcement of our immigration laws. At his option, he can terminate his own custody at any time by re-shipping as a seaman on a foreign ship. It was in that capacity that he obtained admission to the United States on the implied condition that he would re-ship as a seaman within sixty days. There is no injustice to him to hold him to his own representation which he has breached by his unlawful stay here. Although he contradicts the official manifest of the master of his ship in saying that he is not in fact an experienced seaman, and that the sea does not agree with him, it is at least very doubtful whether this statement is genuine, or only a pretense to serve his dominant purpose of remaining in this country. Even though he is probably not an experienced seaman he could apparently be of service to a Greek ship in some useful capacity, as he appears to be in ordinary good health. He also has the option to end his custody by accepting deportation to England. At the hearing he said he was willing to go to England, if "ordered" to do so, but this probably meant he would not voluntarily go there. He speaks English only through an interpreter. There would be no personal injustice to him in going to England where he would be subject to the proper authority of his own government, to which he owes allegiance and support, and also under the protection of any applicable British law which now, so far as possible, is also affording protection to his immediate family in Cyprus. If he is not really fit for sea service, it is not probable that he would be forced into it, although he may be able to serve his government in some other capacity. But however that may be, while this country has no power under existing legislation to impress him into sea service against his will, he has no just cause to be relieved from the strict enforcement of our deportation laws, and to remain at liberty in this country as a sanctuary contrary to our laws.

■ Finally the petitioner contends that he should at least be released on bond pending his actual deportation to Greece, and as authority therefor he refers to the final sentence in 8 U.S.C.A. § 156, reading:

"Pending the final disposal of the case of any alien so taken into custody, he *may* be released under a bond in the penalty of not less than $500 with security approved by the Attorney General, conditioned that such alien shall be produced when required for a hearing or hearings in regard to the charge upon which he has been taken into custody, and for deportation if he shall be found to be unlawfully within the United States." (Italics supplied.)

It is contended that the word "may" in this sentence should be read "must", and it was so held by the Sixth Circuit in Prentis v. Manoogian, 16 F.2d 422; but the weight of authority is to the contrary. United States ex rel. Zapp v. District Directors of Immigration, 2 Cir., 120 F.2d 762, 765; United States ex rel. Carapa v. Curran, 2 Cir., 297 F. 946, 36 A.L.R. 877; United States v. Sisson, D.C., 220 F. 541; 36 A.L.R. 887. Recent district court opinions are to the same effect. In re Hanoff, D.C.Cal.1942, 39 F.Supp. 169; United States v. Garfinkel, D.C., 44 F.Supp. 518; United States v. Tomlinson, D.C., 45 F.Supp. 447; In re Perkov, D.C.Cal., June 8, 1942, 45 F.Supp. 864. Some of the cases hold that the federal courts have no authority to grant bail incidental to habeas corpus proceedings in any deportation case. I am not prepared to say that unusual cases may not arise where the courts should admit to bail in a deportation case as in others where the validity of the detention is under inquiry under a writ of habeas corpus, which is the great bulwark of personal liberty against pos-

sible oppressive official action. See Wright v. Henkel, 190 U.S. 40, 63, 23 S.Ct. 781, 47 L.Ed. 948. But this is not such an exceptional case.

For these reasons, although in my opinion the government officials will not be legally justified in deporting the alien to England, and there surrendering him to the Greek Government functioning in exile, nevertheless the petitioner is not now entitled to release on bond or absolutely until after the lapse of what constitutes a reasonable time, under all the circumstances, to demonstrate that he cannot be deported to Greece directly. The discharge of the present writ does not preclude the petitioner from subsequent application for release on habeas corpus in the appropriate district if, after the expiration of such a reasonable time, it appears that the warrant of deportation cannot be executed. Counsel may submit the appropriate order in due course.