**DELANY, District Director of Immigration,
v. MORAITIS.**

No. 5056.

Circuit Court of Appeals, Fourth Circuit.

May 27, 1943.

130

K. Thomas Everngam, Asst. U. S. Atty., of Baltimore, Md. (Bernard J. Flynn, U. S. Atty., of Baltimore, Md., and Albert E. Reitzel, Acting Gen. Counsel, U. S. Immigration and Naturalization Service, of Washington, D. C., on the brief), for appellant.

Wilfred T. McQuaid, of Baltimore, Md., for appellee.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

PARKER, Circuit Judge.

This is an appeal in a habeas corpus proceeding brought by an alien seaman held under a warrant of deportation issued under the immigration laws. Petitioner is a citizen of Greece who embarked for this country from a port in Spain. That country not being willing to receive him, the Attorney General exercised the option under the statute, 8 U.S.C.A. § 156, to deport him to Greece, the country from which he came, and a warrant of deportation was issued to that effect. At the hearing before the District Judge, it was stated in behalf of the immigration authorities that, as Greece had been overrun by Germany and it was not possible to deport petitioner to Greece, it had been arranged to deliver him into the custody of the Greek government in exile in England. The District Judge entered an order dismissing the writ on condition that the government should not deport the petitioner to any country other than Greece under the warrant for his deportation. See 46 F.Supp. 425. The acting District Director of Immigration has appealed, complaining of the order in so far as it imposes the condition.

Appellant entered this country as an alien seaman in the year 1939. He overstayed his time and was clearly deportable as an alien whose entry was unauthorized. Section 14 of the Immigration Act of 1924, 8 U.S.C.A. § 214 provides that any alien not entitled to enter the United States or who has remained therein for a longer time than permitted under the act or regulations made thereunder, "shall be taken into custody and deported in the same manner as provided for in sections 19 and 20 of the Immigration Act of 1917". Section 19 of the Immigration Act of 1917, 8 U.S.C.A. § 155, provides that any alien of the deportable classes "shall, upon the warrant of the Attorney General, be taken into custody and deported". And section 20 of that act, 8 U.S.C.A. § 156, provides that: "The deportation of aliens provided for in this chapter shall, at the option of the Attorney General, be to the country whence they came or to the foreign port at which such aliens embarked for the United States".

Appellant cannot be deported to Spain, the country from which he embarked for the United States, as that country will not receive him. He cannot be deported to the territory of Greece, since that territory is under German domination. The question presented by the appeal, therefore, is whether, under the statute, the petitioner must be allowed to remain in this country, where he has no right to remain under our laws, or whether the statute will be complied with if he be returned to the political dominion and control of the country from which he came. We think that the latter is the case, and that the condition in the order appealed from should be stricken from it.

It is true, of course, that the term "country" as used in the statute must be construed, ordinarily, to refer to the territory from which the alien came. Mensevich v. Tod, 264 U.S. 134, 136, 44 S.Ct. 282, 68 L.Ed. 591. But a man's "country" is more than the territory in which its people live. The term is used generally to indicate the state, the organization of social life which exercises sovereign power in behalf of the people. United States v. The Recorder, 27 Fed.Cas. page 718, 721, No. 16,129. Ordinarily the state exercises sovereignty only within the territory occupied by its people; but a different situation is presented when the territory is overrun by its enemies and its government is in

exile in the territory of a friendly nation exercising power in international matters in behalf of its nationals. In such case, the government in exile has taken over the only exercise of sovereign power left to the people of the country and is the only agency representing the country with which a foreign government can deal.

It must be remembered in this connection that the deportation of an alien is not a mere matter of taking him beyond the seas and setting him down on foreign soil. Saksagansky v. Weedin, 9 Cir., 53 F.2d 13. It must be carried out through arrangements made with the foreign government. These arrangements are matters arising in the international relationships of the nation; and these international relationships the governments in exile are thoroughly competent to deal with. They are true governments set up and organized to protect the interests of their nationals, and their powers with regard thereto are recognized and respected by the friendly nations in whose territory they function. They exercise sovereign power, moreover, not only with respect to their nationals, but also with respect to the vessels of their countries; and it has long been recognized that a vessel partakes of the character of national territory. It appears in this case that the government of the United States recognizes the Greek government functioning in England as the government of Greece and deals with it as such. In the matter of deporting an alien who has come to this country from Greece, the government must deal with the Greek government in England; and when, under agreement with that goverment, it arranges to return the alien into its power, it is not unreasonable to treat such delivery as a deportation to the "country" whence he came in accordance with the statutory requirement.

■ The word "country" as used in the statute is not a technical or artificial one, and the sense in which it is used must be determined by reference to the purpose of the particular legislation. Burnet v. Chicago Portrait Co., 285 U.S. 1, 5, 6, 52 S.Ct. 275, 277, 76 L.Ed. 587. In that case, which dealt with a credit for a tax paid to the State of New South Wales under a statute allowing credit for taxes paid to a foreign country, the Supreme Court, speaking through Mr. Chief Justice Hughes, said:

"The word 'country', in the expression 'foreign country', is ambiguous. It may be taken to mean foreign territory or a foreign government. In the sense of territory, it may embrace all the territory subject to a foreign sovereign power. When referring more particularly to a foreign government, it may describe a foreign state in the international sense, that is, one that has the status of an international person with the rights and responsibilities under international law of a member of the family of nations; or it may mean a foreign government which has authority over a particular area or subject-matter, although not an international person but only a component part or a political subdivision, of the larger international unit. *The term 'foreign country' is not a technical or artificial one, and the sense in which it is used in a statute must be determined by reference to the purpose of the particular legislation."* (Italics supplied.)

■ The purpose of the deportation statute with which we are dealing is to remove from this country an alien who is here contrary to our laws, and place him under the jurisdiction of the political power to which he owes allegiance. If the word "country" as used in the statute be construed to include the government in exile of a country whose territory has been overrun by the common enemy, the purpose of the statute can be carried out and the alien placed under the jurisdiction of the country to which he owes allegiance and which is charged with his protection. If it be construed as limited to the territory of the nation, which has been thus overrun, the purpose of the statute will be frustrated in cases of this sort; and it will result either that we must suffer an alien who has come from such a country to remain at large in our country contrary to our laws or must support him in prison until such time as he can be returned to the territory now in possession of the enemy. We do not think that any such absurd result could have been within the contemplation of Congress in the passage of the Act; and it is well settled that statutes should be construed, if possible, so as to effectuate the purpose intended and avoid absurd consequences. "All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. It will always, therefore, be presumed that the legislature intended exceptions to its language, which would avoid results of this character. The reason of the

law in such cases should prevail over its letter." United States v. Kirby, 7 Wall. 482, 486, 19 L.Ed. 278; Sorrells v. United States, 287 U.S. 435, 447, 53 S.Ct. 210, 77 L. Ed. 413, 86 A.L.R. 249. "All laws are to be given a sensible construction; and a literal application of a statute, which would lead to absurd consequences, should be avoided whenever a reasonable application can be given to it, consistent with the legislative purpose." United States v. Katz, 271 U.S. 354, 357, 46 S.Ct. 513, 514, 70 L.Ed. 986. See, also, Lau Ow Bew v. United States, 144 U.S. 47, 59, 12 S.Ct. 517, 36 L.Ed. 340; United States v. Ryan, 284 U.S. 167, 175, 52 S.Ct. 65, 76 L.Ed. 224.

■ This is not judicial legislation, as suggested by counsel for petitioner. It is an interpretation of the meaning of the statute as applied to a situation which Congress did not foresee but which the governmental authorities must meet in its application. "To construe statutes so as to avoid results glaringly absurd, has long been a judicial function. Where, as here, the language is susceptible of a construction which preserves the usefulness of the section, the judicial duty rests upon this Court, to give expression to the intendment of the law". Armstrong Varnish Works v. Nu-Enamel Corp., 305 U.S. 315, 59 S.Ct. 191, 200, 83 L.Ed. 195; United States v. American Trucking Association, 310 U.S. 534, 543, 60 S.Ct. 1059, 84 L.Ed. 1345.

■ The problem presented is not theoretical or academic. Desertions of ships by alien seamen who are citizens or subjects of nations overrun by Germany presents a serious problem in the manning of the vessels of these nations whose operation is essential to the war effort in which we are engaged. If by deserting they obtain the right to remain in this country and withdraw themselves from the dangerous commerce in which they are enlisted, with no greater penalty than being supported in prison until the war is over, their desertion will be encouraged. If on the other hand, they are returned to the jurisdiction and power of their governments in exile to be dealt with in accordance with their deserts, the evil will be greatly ameliorated. We cannot think that it was the intention of Congress that the statute should be interpreted in such way as to encourage such desertions. We realize, of course, that the existing situation was not actually in the mind of Congress when the statute was passed; but

statutory interpretation is concerned in determining not alone what situations were actually in the mind of Congress but also the intent and meaning of the language used when applied to situations that were not foreseen at the time. Many statutes must necessarily be couched, as this one was, in general terms. They must be enforced frequently in situations that could not have been foreseen by the lawmakers; and it is the duty of the courts to give them, if possible, an interpretation that will render them workable and avoid unjust and harsh results. We think that an interpretation of this statute to authorize the return of the alien to the power and jurisdiction of the government of his country in exile, where such return cannot be made to the territory of the country because occupied by the common enemy, is a reasonable interpretation of the language used and accords with the general purpose and intent of the statute.

We do not regard Mensevich v. Tod, supra, as in any sense a holding to the contrary. In that case the alien came from Grodno, a territory which had been transferred from Russia to Poland by the treaty of Riga at the time of the deportation; and it was held that a deportation to Poland was in accord with the statutory requirement. The deportation, of course, was carried out pursuant to arrangements made with the Polish government. There is nothing in the opinion to indicate that, if Poland had been overrun by Germany at that time, a delivery of the alien into the power of the Polish government in exile would not have satisfied the statute.

The question is ably treated in a note in the Columbia Law Review vol. XLII, Nov. 1942, p. 1343 et seq., from which we quote the following:

"If 'territory' envelops the full signification of the phrase ['country whence they came'] it is difficult to explain adequately the refusal of the courts to sanction deportation to territories belonging to unrecognized countries. It appears, rather, that deportation to the country whence one came relates to that sovereign considered qualified to exercise power over the absent national who is being deported. This relation is confirmed by construction of the statute by cases which identify the country from which one comes with the last country to which the deportee owed allegiance. In international law the relation is evidenced by the duty of a nation to receive subjects who are deported and its right to

intervene where it considers the deportation proceedings unfair.

"Thus deportation would appear to be an aspect of the exercise of sovereignty over absent nationals. Since the United States has accorded de jure recognition to the Greek government-in-exile stressing the legitimacy of the sovereign powers of that government over their absent nationals, the decision in the instant case would seem to go too far in overriding the option of deportation to England invoked by the Attorney-General. The administrative difficulty of reception of deportees by a government without territory does not preclude deportation thereto. Finally, it would be anomalous to grant these governments a type of recognition which must stress control over absent nationals because the native land and population are in subjugation, while at the same time denying them the deportation rights and duties attached to the recognized government of an absent national."

So far as this petitioner is concerned, he can have no just ground of complaint against an order requiring his return to the Greek government in exile, which has control over vessels flying the Greek flag. It was from such a vessel that he deserted and came into the territory of the United States; and, when he is returned to the jurisdiction of his government, he can be placed by it on such a vessel, where he will be subject to its jurisdiction and laws. He will thus be returned, in a very practical sense, to the place whence he came. Vessels are deemed in law a part of the territory of the country whose flag they fly, and as such are subject to the jurisdiction and laws of that country. 25 C.J. 319; 35 C.J.S., Extraterritoriality, p. 377; Davis Elements of International Law 70, Wilson v. McNamee, 102 U.S. 572, 26 L.Ed. 234; United States v. Rodgers, 150 U.S. 249, 264, 14 S.Ct. 109, 37 L.Ed. 1071. An alien seaman, therefore, who is returned to the jurisdiction of his government and is placed by it aboard one of its vessels, is simply restored to the status which he occupied prior to his desertion. He is returned, not merely to the jurisdiction and power of his country, but to the quasi territory which he left to come into this country in violation of our laws.

The order appealed from will accordingly be modified by eliminating therefrom the attached condition.

Modified.