**CHIEN FAN CHU et al., Appellants,**

v.

**Herbert BROWNELL, Jr., individually and as Attorney General of the United States, Appellee.**

**No. 13643.**

United States Court of Appeals District of Columbia Circuit.

Argued May 14, 1957.

Decided July 18, 1957.

Mr. J. H. Krug, Washington, D. C., for appellant.

Mr. John W. Kern, III, Asst. U. S. Atty., for appellee.

Oliver Gasch, U. S. Atty., Lewis Carroll and Donald E. Bilger, Asst. U. S. Attys., were on the brief for appellee.

Harold D. Rhynedance, Jr., Asst. U. S. Atty., also entered an appearance for appellee.

Before BAZELON, DANAHER and BASTIAN, Circuit Judges.

DANAHER, Circuit Judge.

Appellants, husband and wife, applied for adjustment of immigration status under the provisions of § 6 of the Refugee Relief Act of 1953.[1] An Acting Regional Commissioner after approving the denial of relief as recommended by a Special Inquiry Officer, also denied reconsideration, concluding that "the country of their last residence" was Formosa. In an action seeking declaratory relief, the District Court granted the Government's motion for summary judgment attached to which was the administrative file, and denied appellants' cross motion, supported by the husband's affidavit with annexed exhibits.[2] This appeal turns on the meaning of "last residence" as used in § 6 of the Act, reading in pertinent part:

"Any alien who establishes that prior to July 1, 1953, he lawfully entered the United States as a bona fide nonimmigrant and that he is unable to return to the country of his birth, or nationality, or last residence because of persecution or fear of persecution on account of * * * political opinion * * * may * * * apply to the Attorney General * * * for an adjustment of his immigration status."[3]

Prior to the amendment by the Act approved August 31, 1954,[4] an adjustment of status might have been permitted to an eligible alien only "because of events which have occurred subsequent to his entry into the United States." After the elimination of this clause, the legislation was to be available, as in the instant case, because of events in the country of the aliens' birth, or nationality, or last residence at the time they made their way to the United States. These appellants had been residents of China throughout their entire lives until their arrival on Formosa, November 28, 1948, after their flight from Peiping. Appellant Chu in his application recited the circumstances thus: "I left my home town at the end of Nov. 1948 because of the threat of the Communist military attack. Shortly after I arrived Taiwan, my home was occupied by Communist. Up to date the whole mainland of China, inclu[d]ed my home is under Communist control." The appellant wife described the events: "I left my home town (Peiping) Nov. 1948 prior the attack of Communist. Shortly I went to Taiwan with my husband my home was occupied by the Communist. Up to date the whole mainland of China is under Communist control. I came to United States via France to join my husband, and we are not willing to return our home, since it is controlled by Communist." Further background follows.

Chien Fan Chu, with the rank of lieutenant colonel in the Chinese Army, in 1945 had been honorably released from duty as an interpreter with the U. S. forces in China, with a commendation for having "displayed the highest of soldiery qualities" and for his "cooperation and loyalty." Incidental thereto he was accorded the privilege at Peiping in 1947 of taking an examination which might entitle him to further education and training in the United States. On October 16, 1948, he procured an English translation of the transcript of his record at National Central University in

---

1. 67 Stat. 403 (1953), as amended, 50 U.S.C.A.Appendix, § 1971d.

2. The Government with commendable candor has here pointed out that several important exhibits before the court had not been introduced in the administrative proceedings throughout most of which appellants appeared without counsel.

3. "Any alien" includes one admitted as a student under § 4(e) of the Immigration Act of 1924 now 8 U.S.C.A. § 1101(a) (15) (F) who entered the United States in good faith as a nonimmigrant and who is eligible for adjustment of status under § 6 of the Act. 8 C.F.R. § 245a.2 (Supp.1957).

4. 68 Stat. 1044.

Nanking, China, and then sought the assistance of Professor Shyr, head of the Department of Chemical Engineering of National Central University, at Nanking, China.[5] The latter under date of January 17, 1949, forwarded three letters in Chu's behalf to the Universities of Texas, of Washington and of Wisconsin. During the following weeks Chu traveled back and forth between Formosa and Nanking attempting to expedite necessary documents for his entry into one of the universities and into the United States, and while at Nanking, on April 21, 1949, he was granted a permit to secure a Chinese passport. That day the Nationalist Government of China was forced to remove its operations from Nanking to Canton because of the action of the Communist forces. Chu flew to Canton and there on April 28, 1949, was issued a passport. Then at Canton, he went to the United States Consulate, made preliminary application for a student visa and there took the required physical examination. After long delay during which Chu failed to receive the requested visa from our Consulate at Canton, he presented himself at the American Consulate in Taiwan, Formosa, where, finally in August 1949, he obtained a visa. He left Formosa immediately for the United States.

The University of Washington under date of February 11, 1949, had addressed Chu at National Central University, Nanking, advising that his scholarship had been found excellent and that he was eligible for admission. Transmitted therewith was a statement "For the Immigration Officials" which he was directed to "present to the nearest American Consul when you apply for your passport." Likewise, under date of March 8, 1949, the University of Wisconsin certified that Chu had been accepted

as a student by the graduate school for advanced work in chemical engineering. This exhibit bears the receipt stamp of the Consulate General of the United States at Canton, China, as late as May 4, 1949. A letter from the University of Texas bears the receipt stamp of the Consulate General of the United States at Taiwan under date of July 12, 1949. In short, the record amply demonstrates the course of the efforts made and the circumstances attendant upon the issuance of the visa to Chu as a resident of China.

In 1947 Chu had married Chu Tuan Tieh-mei (hereinafter called appellant wife) whose father was a retired officer of the Nationalist Government owning property in China which the Communist forces have confiscated. The appellant wife was unable to accompany her husband in August, 1949, when he left Formosa for the United States, but was able then to depart for Hong Kong where she remained for five months. Expecting ultimately to join her husband, in the company of friends she left for France and remained in Paris from December 1949 to September 1950. At that time she was granted a Chinese passport, and with an American visitor's visa, she entered the United States at the Port of New York on September 13, 1950. Appellant wife was finally reunited with her husband who upon completion of his studies for a master's degree in chemistry, found employment as a chemical engineer in Illinois. A second child has been born to appellants in Illinois. The record indicates the character of appellants throughout more than the past five years to be excellent and that otherwise they meet the criteria specified in § 6 of the Act upon which the Attorney General must report to Congress.

5. Meanwhile as Communist forces moved toward Peiping which fell in January, 1949, Chu moved his wife and infant child to Formosa where her brother, a lieutenant general in the Nationalist forces had a house. Thither also went Chu's mother. Chu's father, a general in the Nationalist forces, was still in China when last heard from, unable to escape to Formosa. It is believed the Communists have confiscated his property, it was testified, but no attempt was made to communicate with him for fear of further reprisal.

The Act authorized the issuance of two hundred five thousand special non-quota immigrant visas to aliens *"seeking to enter the United States* as immigrants" and to certain members of their families.[6]   Section 4 authorized allotment of visas to certain named categories of "refugees," "escapees" and "German expellees," including not to exceed 2,000 visas to refugees of Chinese ethnic origin.  The appellants were none of these, although they might have sought to *enter* as "refugees" if they had not already been in the United States.  A "refugee" was defined in § 2(a) to mean "any person in a country or area which is neither Communist nor Communist-dominated, who because of persecution, fear of persecution, natural calamity or military operations is *out of his usual place of abode* and unable to return thereto, who has not been firmly resettled, and who is in urgent need of assistance for the essentials of life or for transportation."   (Emphasis above supplied.)

The House bill, H.R. 6481, by its § 6, would have authorized *the Attorney General* to adjust the status of certain aliens in the United States.[7]   Had the House language prevailed, the Attorney General would have been authorized to adjust the status only of certain European aliens as prescribed in § 4, with allotments distributed among German expellees, refugees from West Germany and Austria, and aliens of European origin who "fled from Communist-dominated China after June 16, 1950, and who applied for such visas in Hong Kong."

The Senate language in S.1917,[8] which became the law, markedly differed, not only in its definition of "refugee" as above quoted, but in a complete substitute for § 6.   Thus the Act, by § 6 is available to *any alien* who comes within its terms.  It is not limited to one who is a "refugee" or "escapee" or "German expellee."   Eligibility was extended to

an alien—in the United States—who, because of fear of persecution on account of political opinion, is unable to return "to the country of his birth, or nationality, or last residence."   Here was no requirement that the alien be "out of his usual place of abode" or that he be "unable to return thereto."   Nor was it necessary that an alien not be "firmly resettled" in an intervening country from which he came to the United States and to which he might return.   There was no test that "any alien" be in "urgent need of assistance for the essentials of life or for transportation."   Moreover, the Senate language did not confer upon the Attorney General the power of adjusting immigration status.   On the contrary, Congress reserved *to itself* for decision in each individual case, the question of granting adjustment of status.   In this particular, § 6 provides that the Attorney General in execution of a definitely limited function, must report *to Congress:*

> " * * * If the Attorney General shall, upon consideration of all the facts and circumstances of the case, determine that such alien has been of good moral character for the preceding five years and that the alien was physically present in the United States on the date of the enactment of this Act and is otherwise qualified under all other provisions of the Immigration and Nationality Act except that the quota to which he is chargeable is oversubscribed, the Attorney General shall report to the Congress all the pertinent facts in the case."

It would appear from the record before us that appellants amply fulfill the requirements of the described criteria.   They are aliens, bona fide nonimmigrants, lawfully entered, who filed timely applications for adjustment of status.   As members of high ranking families of Chinese Nationalists, related to officers

---

6.   67 Stat. 401 (1953) 50 U.S.C.A.Appendix, § 1971a.

7.   99 Cong.Rec. 10185 (1953).

8.   Id. at 10248;   and see discussion in Cheng Fu Sheng v. Barber, D.C.N.D.Cal. 1956, 144 F.Supp. 913, 916.

actively opposed to the Communist forces, whose property has already been confiscated, they would seem to have substantial ground for fear of persecution because of their political opinion. The appellant husband had not only been a Nationalist officer, but had been commended for his service to American forces in the Chinese theater. He might well have concluded that he could be a candidate for liquidation by the Communists. On such grounds appellants meet the remaining test of being unable to return to the country of their birth which was also the country of their nationality, China. But, said the Acting Commissioner, conceding they had lived throughout their lives in China until November 28, 1948, they "could have remained on Formosa." Therefore "it will be considered the country of their last residence." He based his *non sequitur,* as the factors recited in his memorandum so clearly show, not on the statutory test for "last residence," but on those essential to establish the status of "refugee," under § 2(a) of the Act. Therein lies error.

The Act before us does not define "residence," but we have had occasion to point out:

"It is axiomatic that residence is not a term of fixed legal definition but takes on shades of meaning *according to the statutory framework in which it is found.*"[9] (Emphasis supplied.)

Section 15[10] provides "Except as otherwise expressly provided by this Act, all of the provisions of the Immigration and Nationality Act (66 Stat. 163) shall be applicable under this Act." Section

101(a) (33) of the Immigration and Nationality Act[11] reads:

"The term 'residence' means the place of general abode; the place of general abode of a person means his principal, actual dwelling place in fact, without regard to intent."

H.R.Rep.No.1365[12] to accompany the Immigration and Nationality Act explains:

"The term 'residence' as defined in section 101(a) (33) means the place of general abode, and the place of general abode of a person means his principal, actual dwelling place in fact, without regard to intent. This definition is a codification of judicial constructions of the term 'residence' as expressed by the Supreme Court of the United States in Savorgnan v. United States, 1950, 338 U.S. 491, 505 [70 S.Ct. 292, 300, 94 L.Ed. 287]. In that case the Court stated:

"Under the act of 1940, the issue is not what her intent was on leaving the United States, nor whether, at any later time, it was her intent to have a permanent residence abroad or to have a residence in the United States. The issue is only whether she did, at any time between July 1941 and November 1945, in fact 'reside' abroad. The test of such 'residence' is whether, at any time during that period, she did, in fact, have a 'principal dwelling place' or 'place of general abode' abroad. She testified that, from 1941 to 1945, she lived with her husband and his family in Rome, except for six months' internment in Salz-

9. Kristensen v. McGrath, 1949, 86 U.S. App.D.C. 48, 53–54, 179 F.2d 796, 801–802, affirmed 1950, 340 U.S. 162, 175, 71 S.Ct. 224, 95 L.Ed. 173. " * * * [W]e cannot concude * * * that a sojourn within our borders made necessary by the conditions of the times was residence within the meaning of the statute." 340 U.S. at page 176, 71 S.Ct. at page 232. " * * * '[R]esident within' * * * implies something more than mere physical presence and

something less than domicile * * *." Guessefeldt v. McGrath, 1952, 342 U.S. 308, 312, 72 S.Ct. 338, 341, 96 L.Ed. 342.

10. Supra note 1, 50 U.S.C.A.Appendix, § 1971m.

11. 66 Stat. 170, 8 U.S.C.A. § 1101(a) (33).

12. 2 U.S.Code Cong. & Adm.News 1952, pp. 1684–85. This report accompanied H.R.Res. 5678, 82d Cong., 2d Sess., which became the Immigration and Nationality Act.

burg, Germany. Whatever may have been her reasons, wishes, or intent, her principal dwelling place was in fact with her husband in Rome where he was serving in his foreign ministry. Her intent as to her 'domicile' or as to her 'permanent residence,' as distinguished from her actual 'residence,' 'principal dwelling place,' and 'place of abode,' is not material * * *."

Congress realized fully that the Court in the Savorgnan case,[13] had construed "place of general abode" to relate to the principal actual dwelling place of a person. The Congressional report designedly described its language as a codification of the judicial construction. The Court had not found that Mrs. Savorgnan's six months' internment at Salzburg broke the continuity of residence at her actual, principal, dwelling place, or place of general abode with her husband, at Rome. Were the period at Salzburg to have been classified as falling within any particular legal pattern, undoubtedly Mrs. Savorgnan would have been considered an internee just as Kristensen was a sojourner whose stay was made necessary by the conditions of the times. So, too, the brief stay of the Chus at Formosa made them mere sojourners there while arrangements were in process for the husband's trip to the United States. The "place of general abode" of these appellants, their "principal, actual dwelling place in fact," was Peiping, China. We can imagine no claim to the contrary had the Chus come directly from Peiping to the United States. Formosa looms large as, but only as, a temporary place of asylum pending completion of the formalities requisite for entry into the United States. They had not sought visas as "refugees" within the meaning of the Act, but rather to enter the United States as bona fide nonimmigrants, the husband as a student, the wife as a visitor. If intent had been

controlling, as of August, 1949, and even as of the later date of the wife's entry, that intent was to return to China when it became safe for them to do so.

When appellant wife was unable to obtain clearance to accompany her husband from Formosa, she went to Hong Kong, remaining five months en route ultimately to the United States via France. She remained nine months in Paris while awaiting a visitor's pass to this country. We have heard no suggestion that France was her "last residence," and indeed, it was not.

Such is not only the history on this record, but it reflects the common sense appraisal of their status as last residing in China as the Act reached out to afford to them while in the United States the relief permitted to "any alien" so situated.

In § 7(d) of the Act [14] Congress dealt with returning aliens to points abroad who might fraudulently have gained admission as refugees. It clearly distinguished "foreign residence" from "last residence" as used in § 6. It required assurances for readmission "to the country of his nationality, foreign residence or in which he obtains a visa under this Act." Likewise the Congress in applying here the "residence" definition of the Immigration and Nationality Act could not have been unaware of the deportation provisions of the latter [15] prescribing, inter alia, deportation "to the country from which such alien last entered the United States." Surely if Congress had intended that these appellants be tested for eligibility under § 6 in terms of the country from which they entered the United States it would have said so, and the husband would be returnable to Formosa and the wife to France. Nor was eligibility to turn on their being "firmly resettled" in Formosa, for they were not refugees abroad but aliens already in the United States, members of the very class for whom § 6 was written.

13. 1950, 338 U.S. 491, 504 et seq., 70 S.Ct. 292, 299.

14. 67 Stat. 404 (1953), 50 U.S.C.A.Appendix, § 1971e(d).

15. 66 Stat. 212, 8 U.S.C.A. § 1253(a).

We are bound to conclude that when Congress used these differing terms in the same act " * * * making each word applicable to a different thing, it did not intend the carefully distinguished and separately defined words to mean the same thing." [16]

We are satisfied that Congress intended the prescribed relief to be available to these aliens in the circumstances set forth, and that the Act is to be liberally construed to provide that relief.[17] There is error and the case is remanded with directions for entry of a judgment declaring China to be their "last residence."

Reversed and remanded.

See also 17 F.R.D. 237.

16. Pillsbury v. United Eng. Co., 1952, 342 U.S. 197, 200, 72 S.Ct. 223, 225, 96 L.Ed. 225.

17. Cf. Shio Han Sun v. Barber, D.C.N.D. Cal.1956, 144 F.Supp. 850, 851.