CHENG LEE KING, Appellant,

v.

Davis H. CARNAHAN, as Regional Commissioner of the Immigration and Naturalization Service, Appellee.

No. 15415.

United States Court of Appeals
Ninth Circuit.

March 24, 1958.

Fallon & Hargreaves, San Francisco, Cal., for appellant.

Lloyd H. Burke, U. S. Atty., Charles Elmer Collett, Asst. U. S. Atty., for appellee.

Before FEE and CHAMBERS, Circuit Judges, and WALSH, District Judge.

CHAMBERS, Circuit Judge.

Cheng Lee King, a merchant seaman born in Hainan Islands (now within the limits of Communist China), seeks adjustment of his immigration status as a permanent resident under Section 6 of the Refugee Relief Act of 1953.[1] He is a national of Communist China, but asserts he is anti-Communist. When eleven years of age he was taken to Singapore in the Malay States where he was a resident until 1939. He left there as a seaman that year and has never returned to Singapore or to China. Since leaving Singapore he seems to have established no residence other than his tenuous "residence" in the United States.

During World War II he sailed out of British ports into the Mediterranean area. Since the war he has been generally on Panamanian Ships (American owned) or on American ships out of American ports.

The immigration service appears to have concluded that he does qualify under the act as having entered the United States lawfully as a non-immigrant, but has denied him adjustment because of his former residence in Singapore. He produces proof that he cannot return to

1. See 50 U.S.C.A.Appendix, § 1971d.

Singapore for residence.[2] Also, he fears persecution in China because of his service on American ships carrying munitions to the Korean theatre during the Korean hostilities. The last two factual matters were conceded by the immigration authorities.

The immigration service and the district court have decided against him. So where can this Philip Nolan go? Of course, the Congress does not have to admit all Philip Nolans. Our question involves a construction of the aforementioned Section 6 which reads as follows:

"Sec. 6. Any alien who establishes that prior to July 1, 1953, he lawfully entered the United States as a bona fide nonimmigrant and that * * * he is unable to return *to the country of his birth, or nationality, or last residence, because of persecution or fear of persecution on account of race, religion, or political opinion,* or who was brought to the United States from other American Republics for internment, may, not later than June 30, 1955, apply to the Attorney General of the United States for an adjustment of his immigration status. If the Attorney General shall, upon consideration of all the facts and circumstances of the case, determine that such alien has been of good moral character for the preceding five years and that the alien was physically present in the United States on the date of the enactment of this Act [August 7, 1953], and is otherwise qualified under all other provisions of the Immigration and Nationality Act [chapter 12 of Title 8] except that the quota to which he is chargeable is oversubscribed, the Attorney General shall report to the Congress all the pertinent facts in the case. If, during the session of the Congress in which a case is reported or prior to the end of the session of the Congress next following the session in which a case is reported, the Congress passes a concurrent resolution stating in substance that it approves the granting of the status of an alien lawfully admitted for permanent residence to such alien, the Attorney General is authorized, upon the payment of the required visa fee, which shall be deposited in the Treasury of the United States to the account of miscellaneous receipts, to record the alien's lawful admission for permanent residence as of the date of the passage of such concurrent resolution. If, within the above specified time, the Congress does not pass such a concurrent resolution, or, if either the Senate or House of Representatives passes a resolution stating in substance that it does not approve the granting of the status of an alien lawfully admitted for permanent residence, the Attorney General shall thereupon deport such alien in the manner provided by law: *Provided,* That the provision of this section shall not be applicable to any aliens admitted into the United States under the provisions of Public Law 584, Seventy-ninth Congress, second session (60 Stat. 764) [section 1641 of this Appendix], Public Law 402, Eightieth Congress, second session (62 Stat. 6) [chapter 18 of Title 22]: *Provided further,* That the number of aliens who shall be granted the status of aliens lawfully admitted for permanent residence pursuant to this section shall not exceed five thousand."

67 Stat. 403 (Aug. 7, 1953) as amended by 68 Stat. 1044 (Aug. 31, 1954).

Literally the key words "unable to return to the country of his birth, or nationality, or last residence" are in the disjunctive. Literally King is entitled to relief if he can't go back because of fear of persecution on account of political opinion to the country of his birth or to

2. It is not contended by King that he fears any persecution in Singapore, if he could return.

the country of his nationality or to the country of his last residence.

When the Congress was passing the act it was in a beneficent mood, but we cannot attribute to the Congress a construction, a meaning so broad as the literal. One must doubt that the Congress was in that beneficent a mood. The immigration service has interpreted the phrase in the conjunctive. It holds that if the alien has two or three countries on his record of birth, nationality and last residence, then before he can establish the basis for change of status in the United States, he must be unable to return to any of the countries because of fear of persecution. Substantially the service is right. But if one rejects the literal meaning of the statutes, the ordinary implications of the disjunctive, does one have to go to the full extreme the other way? The Congress thought it not unfair that a man like King should have to go back to his place of last residence, even though he couldn't go back to the country of his birth and his nationality. But King can't go back to reside in Singapore. So doesn't that put him at least alongside of another King born in Communist China, a national and last resident thereof? Is it reasonable to think that the Congress intended to differentiate between the two?

■ Of course, it is easy for a court to slip into making a rule for what the Congress would have thought if the Congress had thought about the special problem. But it seems to this court, in view of the congressional history of the act, that the Congress did intend, not its literal disjunctive words, but generally the words in the conjunctive, but read in the light of "able to go." [3]

Therefore, while this court cooperates to the extent of rejecting the normal meaning that black is black, it does not go so far as to hold that black is white, just gray.

It is well to keep in mind the objectives of the bill. Mainly it was enacted to provide for the admission of refugees (recent escapees) who had fled from Communist territory and were in camps or in desperate condition in the countries to which they escaped. The bill provided for some 240,000 visas, all told. Incidentally, it was thought advisable to clear up the basis of the presence here of those in a twilight zone, here but essentially stranded as to nationality because of personal anti-Communist problems. So one has Section 6 of the act providing for the admission of 5,000 persons really already here. How close the estimate was is shown by the fact that 4,808 applications had been submitted as of January 2, 1957. Thus, Section 6 is really the appendage to the act.

Appellee here also makes two points never made in the district court. It is now asserted that King's history of touching shore in the United States is such that it cannot be said he "lawfully entered the United States as a bona fide nonimmigrant." In short, "King was here on the wrong dates to qualify."

Second, it is said that he is not really a refugee under the act.

It appears that the immigration service has impliedly found in his favor on the first point. At one time the question of entry and entry dates was an issue in the service as to King, but they themselves dropped it and didn't assert it in the district court.

On the second point, not a refugee, the only facet having merit is the one on construction of Section 6, hereinabove decided in King's favor. To the extent the point was here imported by the government, it should not be heard here anyway unless it was one which demonstrated beyond cavil that the district court

---

3. It would appear that the committee reports in the 1953 act lend support to appellant's view as to purpose. The 1954 Senate Report, relied on by the district court as destroying appellant's construction, must be read in the light of its words "*able* to return to any such country." 2 U.S.Code, Cong. and Adm.News, 83rd Congress, 1st Session, p. 2103, et seq.; 3 U.S.Code, Cong. and Adm.News 83rd Congress, 2nd Session, pp. 3688, 3692. (Emphasis supplied.)

was correct on a ground not used. That has not been demonstrated.

It does not appear that the service has determined that King is a person of good moral character. Not the slightest suggestion is made that he is not. The question would appear to be still open for a ruling administratively.[4]

Reversed for proceedings consistent with this opinion.

4. The appellant did submit proof of good character and proof of reasonable financial responsibility, which in the record has not been questioned.