**LEONG LEUN DO a/k/a Wing Sang,**
**Appellant,**

v.

**P. A. ESPERDY, District Director of Immigration and Naturalization for the District of New York, Appellee.**

No. 345, Docket 27295.

United States Court of Appeals
Second Circuit.

Argued May 3, 1962.

Decided Sept. 28, 1962.

468

Benjamin Gim, New York City, for appellant.

Robert M. Morgenthau, U. S. Atty., S. D. N. Y. (Roy Babitt, Special Asst. U. S. Atty., of counsel), for appellee.

1. Section 6 provides in pertinent part:
"Any alien who establishes that prior to July 1, 1953, he lawfully entered the United States as a bona fide nonimmigrant and that he is unable to return to the country of his birth, or nationality, or last residence because of persecution or fear of persecution on account of race, religion, or political opinion * * * may, not later than June 30, 1955, apply to the Attorney General of the United States for an adjustment of his immigration status."

2. Section 243(a) provides:
"The deportation of an alien in the United States provided for in this Act, or any other Act or treaty, shall be directed by the Attorney General to a country promptly designated by the alien if that country is willing to accept him into its territory, unless the Attorney General, in his discretion, concludes that deportation to such country would be prejudicial to the interests of the United States. No alien shall be permitted to make more than one such designation, nor shall any alien designate, as the place to which he wishes to be deported, any foreign territory contiguous to the United States or any island adjacent thereto or adjacent to the United States unless such alien is a native, citizen, subject, or national of, or had a residence in such designated foreign contiguous territory or adjacent island. If the government of the country designated by the alien fails finally to advise the Attorney General within three months following original inquiry whether that government will or will not accept such alien into its territory, such designation may thereafter

Before LUMBARD, Chief Judge, and WATERMAN and FRIENDLY, Circuit Judges.

WATERMAN, Circuit Judge.

By this appeal appellant raises several issues under the Refugee Relief Act of 1953, § 6, 67 Stat. 403 (1953), as amended, 68 Stat. 1044 (1954), 50 U.S. C.A.Appendix, § 1971d,[1] and the Immigration and Nationality Act of 1952, § 243(a), 66 Stat. 212, 8 U.S.C.A. § 1253 (a).[2]

Appellant is a native and citizen of China. He engaged in the currency exchange business in that country from 1934 to 1949; but in the latter year, fearing persecution at the hands of the

be disregarded. Thereupon deportation of such alien shall be directed to any country of which such alien is a subject national, or citizen if such country is willing to accept him into its territory. If the government of such country fails finally to advise the Attorney General or the alien within three months following the date of original inquiry, or within such other period as the Attorney General shall deem reasonable under the circumstances in a particular case, whether that government will or will not accept such alien into its territory, then such deportation shall be directed by the Attorney General within his discretion and without necessarily giving any priority or preference because of their order as herein set forth either—
"(1) to the country from which such alien last entered the United States;
"(2) to the country in which is located the foreign port at which such alien embarked for the United States or for foreign contiguous territory;
"(3) to the country in which he was born;
"(4) to the country in which the place of his birth is situated at the time he is ordered deported;
"(5) to any country in which he resided prior to entering the country from which he entered the United States;
"(6) to the country which had sovereignty over the birthplace of the alien at the time of his birth; or
"(7) if deportation to any of the foregoing places or countries is impracticable, inadvisable, or impossible, then to any country which is willing to accept such alien into its territory."

Communists, he fled to the Dominican Republic, entering that country on a merchant's visa. He stayed in the Dominican Republic for eleven months, until July 1950. That month he entered the United States as a non-immigrant visitor on a three month permit for the purpose of winding up the affairs of his deceased brother. When he entered this country he possessed a permit from the Dominican Republic giving him the right to re-enter that country if application for re-entry were made within the time limits stated in the permit, and he possessed an airlines return ticket. He remained in the United States beyond the three months' period, his Dominican Republic re-entry permit expired, and the Immigration and Naturalization Service commenced deportation proceedings against him in 1951. At the deportation hearing a Special Inquiry Officer of the Immigration and Naturalization Service concluded that appellant was deportable, and the Board of Immigration Appeals affirmed that decision, but to date he has remained here.

In 1953, to aid persons fleeing from countries taken over by the Communists, Congress passed the Refugee Relief Act of 1953. Two years later appellant applied for adjustment of his status in this country to that of a permanent resident under section 6 of that act. See note 1 *supra*. The Special Inquiry Officer who considered this application denied it for he found on the evidence that the applicant's last foreign residence was in the Dominican Republic and that the applicant had made no showing that he was unable to return to that country on account of persecution or fear of persecution because of race, religion, or political belief. The Acting Regional Commissioner approved the recommendation of the Special Inquiry Officer, and the Immigration Service prepared to deport appellant.

Appellant had elected no country to which he wished to be sent in the event of deportation, and so the Immigration Service, under section 243(a) of the Immigration and Nationality Act of 1952, see note 2 *supra*, asked the Republic of China (Formosa), the Dominican Republic, and the British Crown Colony of Hong Kong whether any of them would accept appellant. The Service did not ask the government on the Chinese mainland. The first two governments contacted refused to accept him, but Hong Kong consented, and he was ordered deported there.

Appellant then brought the present action in the United States District Court for the Southern District of New York so as to obtain judicial review of the order of the Immigration and Naturalization Service denying his application for adjustment of status under the Refugee Relief Act of 1953 and of the subsequent order of the Service directing that he be deported to Hong Kong. The defendant moved for summary judgment, which was granted by the court. The court held, first, that the administrative finding that appellant's last residence was in the Dominican Republic was supported by substantial evidence; second, that as appellant failed to demonstrate that the reason for his inability to return to the Dominican Republic was persecution or fear of persecution, he could not obtain the benefit of the Refugee Relief Act of 1953; and, third, that the Immigration Service was not obligated to ask Communist China to accept appellant before the Service was entitled to deport him to Hong Kong. On appeal from that decision appellant seeks to have us review the action the court below took on each of these three issues.

We shall turn first to a resolution of the second issue, whether appellant's inability to return to the Dominican Republic for reasons other than fear of persecution precludes him from obtaining the benefit of the Refugee Relief Act of 1953, § 6. Inasmuch as our answer to that issue is determinative of the appeal, we would not be warranted in reversing the finding of the Immigration Service that appellant's "last residence" was in the Dominican Republic. The Government

asks us to interpret the language of Section 6 "unable to return to the country of his birth, or nationality, or last residence, because of fear of persecution" to mean that appellant, in order to obtain the benefits of the Act, must show that he is unable to go to the three countries referred to in the statute and that his inability to go to each one of them is caused by persecution or fear of persecution. Appellant, on the other hand, seeks to have us adopt the interpretation which the Court of Appeals for the Ninth Circuit reached and applied in Cheng Lee King v. Carnahan, 253 F.2d 893 (9 Cir.1958). In that case a merchant seaman, a Chinese national, born in China but with a "last residence" in Singapore, sought permanent residence under the Refugee Relief Act of 1953, § 6, alleging a fear of persecution in China and an inability to return to Singapore for a different reason. The Ninth Circuit held that the statutory language permits relief to be given to an alien applicant who demonstrates that he is unable to return to any one of the three countries because of persecution or fear of persecution, and also demonstrates an inability, for whatever reasons, to return to the others.

The Refugee Relief Act of 1953 was enacted mainly to provide admission into this country for about 240,000 persons who had fled from Communist governments and were living abroad in desperate conditions. Section 3 of the act, 67 Stat. 401 (1953), 50 U.S.C.A.Appendix, § 1971a (1958), authorized the issuance of 205,000 special nonquota immigrant visas for those aliens and an additional number of such visas for their spouses and dependents. Section 4, 67 Stat. 401 (1953), 50 U.S.C.A.Apppendix, § 1971b (1958), allotted these visas among refugees having various ethnic origins. Section 2(a), 67 Stat. 400, 50 U.S.C.A.

Appendix, § 1971(a), defined "refugee" as follows:

"(a) 'Refugee' means any person in a country or area which is neither Communist nor Communist-dominated, who because of persecution, fear of persecution, natural calamity or military operations is out of his usual place of abode and unable to return thereto, who has not been firmly resettled, and who is in urgent need of assistance for the essentials of life or for transportation."

Section 6, with which the present case is primarily concerned, was intended to grant relief to a rather small group of not more than 5000 persons who had entered this country as bona fide nonimmigrants and were stranded here because of persecution at home.[3] It was the purpose of this relatively insignificant provision of the act to extend refugee relief to those aliens stranded in the United States who would have come within the other provisions of the act if they had been refugees abroad. The House Report to the 1953 act stated:

*Section 6*

"The proposed adjustment of status of aliens who would fall within the refugee categories specified in section 4 except for the fact that they are now in the United States, having entered lawfully in a temporary nonimmigrant status, represents the committee's belief that relief should be granted to bona fide temporary residents, if aliens in situations identical to theirs are to be permitted to avail themselves of newly offered immigration opportunities." H.R.Rep.No.974, 83d Cong., 1st Sess. 18 (1953), U.S. Code Congressional and Administrative News 1953, p. 2103.

---

3. As originally enacted in 1953, section 6 required that the persecution or fear thereof result from events occurring after the alien had entered this country. 67 Stat. 403 (1953). The 1954 amendment removed this limitation. See S.Rep. No. 2045, 83d Cong., 2d Sess. 4–5 (1954), U.S.Code Congressional and Administrative News 1954, p. 3688.

■ An alien lawfully present in the United States in the temporary status of a non-immigrant visitor is a person entitled to seek the relief afforded by section 6, if "he is unable to return to the country of his birth, or nationality, or last residence, because of persecution or fear of persecution * * *." Thus, without according to any one of the three countries a priority over the other two, the statute refers to the country of the applicant's birth, the country of his nationality, and the country of his last residence. If the present case involved an applicant's inability, because of a non-persecutory reason, to return to the first-mentioned country, that of his birth, instead of inability, for a non-persecutory reason, to return to the third-mentioned country, that of his last residence, it seems clear that the applicant would be eligible for section 6 relief if he could not return to his last residence because of fear of persecution there. Regardless of his place of birth or of nationality, a person who is fleeing from persecution in the country of his last residence and who is present on a temporary basis in a displaced persons' center, or anywhere else in the world in a country not that of his last residence, would obviously be a refugee within the spirit and the letter of the Refugee Relief Act. In the words of Section 2(a), such a person would be out of "his usual place of abode," "unable to return thereto," and "not firmly resettled"—all as a result of persecution or fear of persecution. As pointed out above, section 6 of the act was intended to benefit persons already within the United States as bona fide non-immigrant aliens who would have been refugees under other provisions of the act if they were beyond our borders. It would be contrary to the humane policy of the act, and an oppressive interpretation of section 6 thereof, to preclude a longtime resident and national of a country taken over by the Communists from obtaining the relief provided by section 6 for the sole reason that he was born outside of that country (assuming that he is unable to return to the place of his birth for a non-persecutory reason).

Here, instead of the supposititious case just discussed, we have a case involving flight from a Communist government in the country of one's birth and nationality, coupled with an inability, for a non-persecutory reason, to return to one's last residence. Inasmuch as the statute envisions no priorities among the three countries set forth therein, we should decide the case before us, unless there be a clear reason for a contrary ruling, in the same way that the case mentioned in the preceding paragraph would be decided.

Appellant is one who fled persecution at the hands of the Communists. His entire odyssey away from his homeland, now in its thirteenth year, commenced as a result of the Communist conquest of China. Furthermore, it cannot be said that he was "firmly resettled" in the Dominican Republic even if under our immigration laws he was technically a "resident" of that land.[4] Leong Leun Do entered the Dominican Republic and remained there eleven months on a businessman's visa. Neither party to this litigation has given us the text of the Dominican Republic's immigration laws which define the status of one in that country on such a visa. However, if the law of the Dominican Republic is at all similar to the United States statute applicable to business visitors, it is clear that appellant could only remain in the Dominican Republic temporarily.[5] Ap-

4. Section 101(a) (33) of the Immigration and Nationality Act of 1952, 66 Stat. 173, 8 U.S.C.A. § 1101(a) (33) defines "residence" as follows:
"(33) The term 'residence' means the place of general abode; the place of general abode of a person means his principal, actual dwelling place in fact, without regard to intent."

5. The status of a non-immigrant businessman alien is defined in the Immigration

pellant certainly fits into the current image of a political refugee. It should be noted that the Court of Appeals for the District of Columbia Circuit has announced that applicants for adjustment of status under section 6 need not comply with all of the specific requirements imposed on those who would seek entrance into the United States as "refugees" under the other provisions of the Refugee Relief Act of 1953. Chien Fan Chu v. Brownell, 101 U.S.App.D.C. 204, 247 F.2d 790, 793, 795 (1957).

It might be asserted that the purpose of the Refugee Relief Act did not include relief to fleeing persons who had already found havens abroad. The conference report to the 1953 act, however, in defining the term "firmly resettled" tends to refute this proposition:

> "While no definition is contained in the act, the conferees wish to state that the term 'firm resettlement' as applied to prospective beneficiaries of this legislation is not designed automatically to exclude aliens from the refugee category solely on the ground that they have been collectively, by law or edict, granted full or limited citizenship rights and privileges in any area of their present residence." Cong. R. 1069, 83d Cong., 1st Sess., 2 U.S. Code Cong. & Ad.News, p. 2123 (1953).

Also, we point out that section 6 of the Refugee Relief Act only applies to non-immigrant aliens who lawfully entered this country before the enactment of that statute. Therefore, even if we hold in appellant's favor, we shall not be fostering schemes by which persons born in Communist-controlled countries, but longstanding residents of other countries not Communist-controlled, enter the United States as bona fide non-immigrants, and then purposefully foreclose their rights to re-enter the land of their last residence, thereby claiming a right to permanent residence here under section 6. In other words, our decision here only affects aliens present here prior to midsummer 1953, and does not involve persons who will intentionally but unjustifiably seek to qualify for the privilege bestowed by section 6.

■ True, interpreting the language of section 6 in the way appellant asks us to interpret it could conceivably lead to an extension of the coverage of the section to include a person born in a country now Communist-controlled and who, having for many years resided in a non-Communist country, happened to be lawfully in the United States on August 7, 1953, and who, by plan or accident, precluded a return to his last residence abroad. Even if it were not one of the purposes of the Refugee Relief Act to facilitate such a person's permanent residence in the United States we would hazard a guess that there are very few persons, if any, in this position. Moreover, within section 6 itself Congress inserted a safeguard that would prevent such persons from taking advantage of the section's benefits, for it is provided that Congress must approve by concurrent resolution the granting of permanent resident status to any alien seeking the benefit of section 6 before an alien

and Nationality Act of 1952, § 101(a) (15) (B), (E), 66 Stat. 171, 8 U.S.C.A. § 1101(a) (15) (B), (E):
"(B) an alien * * * having a residence in a foreign country which he has no intention of abandoning and who is visiting the United States *temporarily* for business * * *
"(E) an alien entitled to enter the United States under and in pursuance of the provisions of a treaty of commerce and navigation between the United States and the foreign state of which he is a national * * * (i) *solely* to carry on substantial trade, principally between the United States and the foreign state of which he is a national; or (ii) *solely* to develop and direct the operations of an enterprise in which he has invested, or of an enterprise in which he is actively in the process of investing, a substantial amount of capital * * *." (Emphasis added.)

may attain that status.[6]   Hence we should resolve whatever ambiguities there may be in the statutory language so as to preserve to Congress this final power to decide an alien's status under the act.

■   Another argument against appellant's interpretation of the clause "unable to return to the country of his birth, or nationality, or last residence, because of persecution or fear of persecution" is that the words "because of persecution or fear of persecution" should in every instance modify the phrase "unable to return." As we have shown, a blind literalism leads to absurd results that would negate, in worthy cases, the very purposes which the Act was adopted to accomplish. This being so, the statute should be interpreted so as to include all worthy cases (even if an occasional unworthy one is also included) rather than to exclude worthy cases because of the possibility that an interpretation consistent with the Congressional purposes may give an occasional opportunity to an unworthy one.

■   If Congress had clearly manifested an intention contrary to appellant's position we would interpret the statutory language in accordance with the grammar of the sentence. But Congress has nowhere indicated an awareness of the problem presented to us by this appeal. The most that we can infer from the legislative history of the 1953 act and its 1954 amendments is that Congress intended that one should read the countries listed in the statute in the conjunctive instead of in the disjunctive.[7]   Apparently Congress did not

6.  Section 6 provides:
    "[T]he Attorney General shall report to the Congress all the pertinent facts in the case. If, during the session of the Congress in which a case is reported or prior to the end of the session of the Congress next following the session in which a case is reported, the Congress passes a concurrent resolution stating in substance that it approves the granting of the status of an alien lawfully admitted for permanent residence to such alien, the Attorney General is authorized, upon the payment of the required visa fee, which shall be deposited in the Treasury of the United States to the account of miscellaneous receipts, to record the alien's lawful admission for permanent residence as of the date of the passage of such concurrent resolution. If, within the above specified time, the Congress does not pass such a concurrent resolution, or, if either the Senate or the House of Representatives passes a resolution stating in substance that it does not approve the granting of the status of an alien lawfully admitted for permanent residence, the Attorney General shall thereupon deport such alien in the manner provided by law * * *."

7.  The legislative reports to the 1953 act do not refer to any situation involving more than one country. See H.R.Rep. No. 974, 83d Cong., 1st Sess. (1953); S.Rep. No. 629, 83d Cong., 1st Sess. (1953).

    In 1954 the House proposed to amend section 6 to read as follows: " * * * unable to return to the country of his birth, nationality, *and* last residence because of persecution or fear of persecution * * *" (Emphasis added.) H.R. 8193, 83d Cong., 2d Sess. § 3 (1954). The Senate deleted the word "and" and restored the "or" construction found in the 1953 act. Thus, in the statute the countries have always been separated by the word "or." When it restored the "or," the 1954 Senate Committee on the Judiciary commented:
    "The committee has restored the language 'birth, or nationality, or last residence,' which is the language presently contained in section 6 of the Refugee Relief Act of 1953. The committee understands that this language has been construed by the Immigration and Naturalization Service to mean that if the applicant for adjustment is able to return to any such country without persecution or fear of persecution, he is not eligible for adjustment. Since the existing language, as construed, correctly expresses the intent of the section no purpose would be served by modifying the language as proposed in the bill."
    S.Rep. No. 2045, 83d Cong., 2d Sess. 5 (1954).
    This statement by the Senate Judiciary Committee makes it clear that the countries listed in the statute should be read in the conjunctive. But it is a *non sequitur* to conclude that by referring to the situation in which one is *able to return* to one of the listed countries the committee had also considered the situa-

think it inequitable to require a person to return to one of the three countries, if he could so return, even if he could not return to one or both of the other two countries. See Cheng Lee King v. Carnahan, 253 F.2d 893 (9 Cir.1958); Lubini v. Brownell, 102 U.S.App.D.C. 125, 251 F.2d 28 (per curiam), cert. denied, sub nom. Lubini v. Rogers, 356 U.S. 966, 78 S.Ct. 1005, 2 L.Ed.2d 1073 (1958); Fong Sen v. United States Immigration and Naturalization Serv., 137 F.Supp. 236 (E.D.La.), aff'd per curiam, 234 F.2d 656 (5 Cir.1956). In the case before us, however, the applicant cannot return to any of the three countries.[8]

As the court below recognized, 197 F.Supp. at 607, there is no indication that any draftsman or congressman intended to deny relief to aliens in appellant's situation, or that any thought was given to the particular problem before us. Hence it is hopeless to seek a mythical congressional "intent" in order to resolve the issue at hand. Cf. Associated Telephone & Telegraph Co. v. United States (2 Cir.1962), 306 F.2d 824.

Even as the whole is often greater than the sum of its parts, a statute may encompass more than the combination of its properly parsed phrases. We agree with the statement of Judge Her-

lands in D'Antonio v. Shaughnessy, 139 F.Supp. 719, 723 (S.D.N.Y.1956), that "the statute * * * apparently reflects a liberal and remedial purpose on the part of Congress; and it should be construed to effectuate that purpose." See also Ching Lan Foo v. Brownell, 148 F.Supp. 420 (D.D.C.1957); Shio Han Sun v. Barber, 144 F.Supp. 850 (N.D.Cal. 1956). Furthermore, it does not appear that a holding favorable to the alien in this case would be inconsistent with any of the policies behind the statute. If we are wrong in this assumption, Congress may still correct our error, as provided by the very section that we are now interpreting.[9] With these considerations in mind, we deem it wiser and fairer to interpret the statute in favor of the alien. Therefore, we conclude that under section 6 of the Refugee Relief Act of 1953 an alien who establishes that he is unable to return to one or more of the three countries listed therein because of persecution or fear of persecution and is also unable to return to the remaining countries for nonpersecutory reasons is eligible to seek the relief that Act provides.

Accordingly, it is unnecessary for us to discuss the other two issues set forth earlier in this opinion that appellant presented to us on this appeal.

tion created when one is *unable to return* to one country because of persecution and *unable to return* to the other country or countries for other reasons.

The statement just quoted was immediately preceded in the Senate Report by this less illuminating comment:

"The proposed amendment would * * * permit the adjustment in those cases where because of events which existed at the time the refugee fled to this country he cannot return to his place of birth, or place of his nationality, or place of his last residence, because of fear of persecution in any of those countries if there is more than one."

The Senate Report also stated one of the purposes of the 1954 amendments to be: " * * * (3) [to] permit additional refugees within the United States who are unable to return to any country of their birth, nationality, or last residence because of fear of persecution * * *." Id. at 1; see note 3 supra.

8. In Fong Sen v. United States Immigration and Naturalization Serv., supra, District Judge (later Circuit Judge) Wright, in holding against the alien in that case, pointed out that Fong Sen was able to return to the country of his last residence, but the opinion does not disclose whether that fact was essential to the holding the court reached.

9. Section 6 of the Refugee Relief Act is not one of the provisions in our immigration laws that grants broad discretionary power to the Immigration Service. Compare Immigration and Nationality Act of 1952, § 243(h), 66 Stat. 214, 8 U.S. C.A. § 1253(h). In the Refugee Relief Act, § 6, Congress retained for itself the power to exercise discretion. Cheng Fu Sheng v. Barber, 269 F.2d 497 (9 Cir. 1959); see 105 Cong.Rec. 17586 (1959); H.R.Rep. No. 1176, 86th Cong., 1st Sess. (1959).

The judgment of the district court is reversed and the cause remanded to that court for further proceedings not inconsistent with this opinion.

LUMBARD, Chief Judge (concurring).

I am unable to agree with the majority's construction of § 6 of the Refugee Relief Act of 1953, 67 Stat. 403, as amended, 50 U.S.C.A.Appendix, § 1971d. As I read the statute, the appellant was ineligible for relief under § 6 because it was not likelihood of persecution which made him unable to return to the Dominican Republic, found on sufficient evidence in the court below to be the place of his last residence. However, I concur in reversing the judgment of the district court because the government failed to comply with the procedures prescribed by § 243(a) of the Immigration and Nationality Act, 66 Stat. 212 (1952), 8 U. S.C.A. § 1253(a), and the order of deportation to Hong Kong is for that reason invalid.

The district court ruled that in order to obtain the benefit of § 6, an alien must show that "he is unable to return to the country of his birth, or nationality, or last residence" and that as to all three, the inability must be "because of persecution or fear of persecution on account of race, religion, or political opinion." I agree with the district court.[1] The majority believes with the Ninth Circuit, Cheng Lee King v. Carnahan, 253 F.2d 893 (1958), that so long as an alien is unable to return to one of the three places designated because of persecution or fear of persecution and is unable to return to the other two for any reason whatever, he has met the statutory requirements.

The mere fact that a person cannot gain entry to the place of his birth, nationality, or last residence will not keep him in this country. See Immigration and Nationality Act, § 243(a) which designates the countries to which aliens shall be deported.[2] Nor will the fact that in one or two of such places he fears persecution, if he can safely go to the third. Cheng Lee King, supra. Thus in this case, had the appellant been denied admission in all of such places for reasons not involving persecution, he would have been deported. Similarly, had the Dominican Republic been willing to receive him, he would have been deported notwithstanding his inability to go to China, the country of his birth, because of persecution.

I am unable to see why the threat of persecution in one place should be deemed to "cover" other places closed to the appellant for reasons not involving persecution. Our immigration laws do not guarantee an alien admission unless three other countries where there is no threat of persecution will consider his application for entry. Had the appellant been born and always resided in the Dominican Republic, he would not be entitled to relief under § 6, since persecution would not be involved. He is in no worse position than if that were the case; yet under the majority view, the fact of persecution in China, irrelevant to his status in the Dominican Republic, protects him. The appellant's situation cannot be compared to that of one who fears persecution in the land of his birth or nationality, where he has resided, and

---

1. In Lubini v. Brownell, 102 U.S.App.D.C. 125, 251 F.2d 28, certiorari denied sub nom. Lubini v. Rogers, 356 U.S. 966, 78 S. Ct. 1005, 2 L.Ed.2d 1073 (1958), the Court of Appeals for the District of Columbia Circuit said in a *per curiam* opinion that an applicant for relief under § 6 must show that "he will be subject to persecution 'on account of race, religion, or political opinion' in the country of his birth * * * and in the country of his nationality * * * and in the country of his last residence * * *." The court did not discuss the particular issue presented here, but the quoted language suggests agreement with the district court's and my construction of the statute.

2. If none of the countries in certain prescribed categories will receive him, the alien may be deported "to any country which is willing to accept such alien into its territory."

who has not found a residence elsewhere. For such a person, it *is* persecution which has closed all the likely doors to him and set him adrift.

The majority reasons that § 6 complements §§ 2–4 of the Refugee Relief Act, 67 Stat. 400, 50 U.S.C.A.Appendix, §§ 1971–1971b, by extending relief to persons who are temporarily in this country as nonimmigrants but who otherwise qualify for entrance under those sections. It then reasons that §§ 2–4 would admit one who, whatever his status in the country of his birth, could not return to the place of his last residence by reason of persecution. Therefore, the majority says, since § 6 is to be read to conform to the other sections, it must allow to remain a nonimmigrant who, unable for any reason to return to the country of his birth, cannot return to the place of his last residence by reason of persecution. The final step in this chain of reasoning is that since § 6 "envisions no priorities among the three countries [birth, nationality, and residence]," the same result must be reached for a nonimmigrant who for any reason cannot return to his last residence and fears persecution in the country of his birth.

· But it is crystal clear that .§§ 2–4 would not admit to this country one who has had a residence abroad solely because the country of his birth might persecute him; those sections impose requirements not limited to the one that the alien be "out of his usual place of abode and unable to return thereto" and "not * * * firmly resettled." 50 U.S.C.A.Appendix, § 1971(a). The majority thus reaches by a series of steps a result in conflict with its original premise that the various sections must be read as nearly as possible as one. By the majority's reasoning, one who entered this country as a nonimmigrant and then for some reason cannot return to his last residence is given a statutory preference over one who equally fears persecution in the land of his birth or

nationality but who has remained in his last residence abroad.[3]

It is true that one who has maintained a residence elsewhere is better off than one like the appellant, who, having had such a residence, came temporarily to this country as a nonimmigrant and is now denied permission to return to his residence. But had the appellant been deported from the Dominican Republic for reasons not involving persecution, §§ 2–4 would not gain him admission here simply because he might be persecuted in China and had no place else to go. And that is the closest parallel to the situation of this case. The sole distinction is the appellant's nonimmigrant status. Yet it is that very distinction which the majority, pursuant to legislative policy, claims should not be determinative.

The simple fact is that § 6 does differ significantly from the other sections. Section 2(a) defines a "refugee" as one

> "who because of persecution, fear of persecution, natural calamity or military operations is out of his usual place of abode and unable to return thereto, who has not been firmly resettled, and who is in urgent need of assistance for the essentials of life or for transportation."

The majority notes with approval the ruling in Chien Fan Chu v. Brownell, 101 U.S.App.D.C. 204, 247 F.2d 790 (1957) that applicants under § 6 need not meet all the requirements of § 2(a). Plainly then, the two sections differ as to those whom they protect. Section 3 imposes a general maximum on the number of visas to be issued to refugees, and § 4 allocates the total among various groups. Nonimmigrants under § 6 are not included in these quotas, but are included in a separate, unclassified quota of 5000. Since §§ 2–4 so clearly impose requirements on refugees inapplicable to nonimmigrants, it is difficult to understand the majority's insistence that § 6

---

3. This would be true even if the "last residence" requirement of § 6 is construed to mean less than the § 2(a) requirement that the refugee be "not * * * firmly resettled."

imposes no requirements on nonimmigrants inapplicable to refugees.

The majority concedes the difficulties of its construction of § 6, but argues that the result would be more absurd if it ruled the other way. Yet the supposed absurdity arises only because the majority blinks the differences between the requirements of §§ 2–4 and § 6 at the same time that it recognizes them. The sum of the difference is that the former sections afford entry to those who are uprooted from their homes by persecution, while the latter allows to remain here those who, having anticipated that they would have to depart, find closed because of persecution the countries to which their natural desires might lead them. Since our general immigration laws do not suspend deportation simply because an alien cannot gain entry to the country of his choice, I see no difficulty in reconciling the various provisions.

It is not for this court to decide how far the "humane policy of the act" should extend, nor should we reach out for a particular interpretation because another may seem "oppressive." These are matters for congressional determination. On the other hand, we cannot avoid the careful construction of a statute on the ground that Congress can correct our errors.

The second part of this case concerns the propriety of the order directing deportation of the appellant to Hong Kong pursuant to § 243(a) of the Immigration and Nationality Act. That section directs that if an alien fails to designate the country to which he chooses to be deported or if the country which he designates refuses to receive him or fails to respond within three months to an inquiry whether it will do so, he shall be deported "to any country of which such alien is a subject national, or citizen if such country is willing to accept him into its territory." Only after this possibility has been explored and has failed may deportation be directed to a country within other specified categories.

The appellant contends that he is a national and citizen of the mainland of China and that since the Attorney General made no prior inquiry of the mainland government whether it would accept the appellant, the order of deportation to Hong Kong was not made pursuant to the prescribed procedure and is void. Since the appellant was born and resided on the mainland until his flight to the Dominican Republic,[4] his contention must be upheld, unless the inquiry which was made to the Nationalist Government whether it would receive him on Formosa satisfied the requirements of § 243(a). In my opinion it did not.

The government has contended in the past, and this court has held, that the Chinese mainland is a "country" to which an alien may be deported under § 243(a). United States ex rel. Tom Man v. Murff, 264 F.2d 926 (2 Cir.1959); United States ex rel. Leong Choy Moon v. Shaughnessy, 218 F.2d 316 (2 Cir. 1954). In Chan Chuen v. Esperdy, 285 F.2d 353 (2 Cir.1960) (per curiam), we refused to accept the technical argument that Hong Kong was a colony of the United Kingdom and therefore not a "country," and said: "[A]ny place possessing a government with authority to accept an alien deported from the United States can qualify as a 'country' under the statute." Id. at 354. See also Rogers v. Cheng Fu Sheng, 108 U.S. App.D.C. 115, 280 F.2d 663, cert. denied, 364 U.S. 891, 81 S.Ct. 222, 5 L.Ed.2d 187 (1960). It would do violence to the ordinary use of language if within a single section of a statute, the word "country" had one meaning when used alone and another when used in the phrase "country of which such alien is a subject national, or citizen." Such a result could be justified only if national policy clearly demanded deference in this respect to the nonrecognition of the Communist government.

---

4. Between 1925 and 1934, the appellant resided temporarily in the United States.

Before that period and after it (until his flight) he resided on the mainland.

To rule that for purposes of § 243(a), the Chinese mainland is a country of which an alien may be a subject national or citizen imposes no greater requirement on this government than that the immigration authorities inquire whether the Communist government will accept this alien on its territory, something which we have already required it to do in other situations arising under § 243(a). Tom Man, supra.[5] See Leong Choy Moon, supra, 218 F.2d at 319. The same requirement was imposed in Lu v. Rogers, 164 F.Supp. 320 (D.D.C.), affirmed per curiam, 104 U.S.App.D.C. 374, 262 F.2d 471 (1958). It does not interfere with this government's policy of nonrecognition in any other respect, nor does its imply anything about the capacity of the Communist government to confer citizen status in any other context. In short, I would simply recognize the realities of the situation here as we have done when it was the government that was asserting its power to deport to the mainland of China.

It is true, as the government contends, that § 243(a) was designed to facilitate deportation proceedings by increasing the number of places to which deportation may be ordered, Chan Chuen, supra, but nothing that I have said here runs counter to that policy. And since § 243 (a) does not authorize deportation to any country at all unless specified countries, including the one of the alien's choice, have denied admission, it is plain that Congress had in mind also the reasonable desires of the alien. It would be harsh indeed and contrary to the spirit of the statute if an alien could be denied deportation to a country with which he had all his natural ties simply because

this government had, perhaps temporarily, withheld or withdrawn diplomatic recognition from the government in power for reasons unconnected with the alien's status as a citizen of that country. Yet that is where the government's logic leads.

The district court ruled that the failure to comply with § 243(a) was in effect harmless error, inasmuch as the appellant has been attempting to avoid deportation to the Chinese mainland from fear of persecution. It might be enough to say that in a matter of such consummate importance to an individual as deportation proceedings, the courts should insist that the letter of the law be observed. In this case, there is further ground for not regarding this contention as frivolous. Under § 243(h) of the Immigration and Nationality Act, 66 Stat. 214 (1952), 8 U.S.C.A. § 1253(h), the Attorney General has authority to withhold deportation of an alien "to any country in which in his opinion the alien would be subject to physical persecution and for such period of time as he deems to be necessary for such reason." Whether the Communist government would respond affirmatively to an inquiry concerning the appellant and whether, if it did, he could secure a stay of deportation under § 243(h) is beside the point until the inquiry is made. It is sufficient now to note the possibility that had the government complied with the procedures of § 243(a), the appellant would not face immediate deportation.[6] This is not a case in which the alien had designated as the country of his choice the one deportation to which he later claims will subject him to persecution; in such a case, it might rea-

---

5. In Tom Man, supra, the court "assumed" that an alien could not be regarded as a "subject national or citizen" of the Communist government "because we do not recognize that as more than a *de facto* government." 264 F.2d at 928. However, that issue was not necessary to the court's ruling, which was only that deportation of an alien to the Chinese mainland must be preceded by an inquiry

of the Communist government whether it will accept him.

6. In the past blanket orders have been issued under § 243(h) temporarily staying the deportation of Chinese nationals who claim that they will be subject to persecution if deported to the mainland. See orders dated October 31, 1956 and June 14, 1957 in the case of Lee Sung, File A–7921505—New York.

sonably be argued that the designation constituted a waiver of the relief provided by § 243(h). Appellant's situation seems to be precisely that for which that section was designed. An application for relief under § 6 of the Refugee Relief Act should not have the effect of a waiver of the independent relief available under § 243(h), particularly when, as I find, § 6 is inapplicable to the appellant.

Since, in my view, the order of deportation to Hong Kong was improper, I concur with the majority in reversing the judgment of the district court.

