LEE WEI FANG et al., Appellants,

v.

Robert F. KENNEDY, Attorney General of the United States, Appellee.

WANG SIANG–KEN et al., Appellants,

v.

Robert F. KENNEDY, Attorney General of the United States, Appellee.

Nos. 16996, 16997.

United States Court of Appeals District of Columbia Circuit.

Argued Dec. 3, 1962.

Decided March 25, 1963.

Wright, Circuit Judge, dissented.

Mr. David Carliner, Washington, D. C., with whom Mr. Jack Wasserman, Washington, D. C., was on the brief, for appellants.

Mr. Paul A. Renne, Asst. U. S. Atty., with whom Messrs. David C. Acheson, U. S. Atty., Nathan J. Paulson, Asst. U. S. Atty. at the time the brief was filed, and Gil Zimmerman, Asst. U. S. Atty., were on the brief, for appellee.

Before WASHINGTON, BASTIAN and WRIGHT, Circuit Judges.

WASHINGTON, Circuit Judge.

These are deportation cases, involving the special problems of the Government in dealing with persons of Chinese origin. All the plaintiffs-appellants, thirty-four in number, were born on the mainland of China prior to the time that the Chinese Communists drove out the Nationalist Chinese Government recognized by the United States as the legal government of China. All appear to have left the mainland of China for Taiwan or Hong Kong some years before their entry into the United States, and none came to the United States from the Chinese mainland. All, except one who was admitted to the United States on a six months visitor's visa, were non-immigrant seamen admitted to the United States for the period their vessel was

in port, not to exceed twenty-nine days. All admit that they remained in the United States beyond the time allowed them, and all concede that they are deportable. The cases were presented to us on the basis that none of them had exercised the privilege given in the governing statute of designating the country to which he wished to be deported.[1] See Sec. 243 (a) of the Immigration and Nationality Act, 66 Stat. 212, 8 U.S.C. § 1253(a) (1958).[2]

Following hearings in each case, the Attorney General found that the appellants were natives and citizens of China and made inquiry of the Nationalist Chinese Government as to whether it would accept them. That Government indicated it would accept only the appellants in No. 16,997, thirteen in number: these the Attorney General ordered deported to Taiwan, also known as Formosa. The remaining twenty-one, those in No. 16,996, were acceptable to the authorities in Hong Kong, and the Attorney General ordered them deported there under the alternatives in the third part of the statute.

These suits were then brought in the District Court, on the theory that each plaintiff-appellant was a "subject, national and citizen" of Communist China, and that the Attorney General was obliged under the Act to ask the Government of Communist China to accept him, before asking any other government to do so. This contention had not been advanced at any earlier stage.

Both the appellants and the Government filed motions for summary judgment. Included as a part of the Government's motions were the certified administrative records of the Immigration and Naturalization Service relating to each plaintiff. The District Court, after

1. Apparently this was so presented as a matter of convenience, as in fact a number of the appellants indicated preferences—though sometimes on an informal basis. None indicated a preference for Communist China. None now complains that an indicated preference was disregarded by the Attorney General. See, further, fn. 10, *infra.*

2. Section 243(a) provides in pertinent part:
"The deportation of an alien in the United States provided for in this chapter, or any other Act or treaty, *shall be directed by the Attorney General to a country promptly designated by the alien if that country is willing to accept* him into its territory, unless the Attorney General, in his discretion, concludes that deportation to such country would be prejudicial to the interests of the United States. * * * If the government of the country designated by the alien fails finally to advise the Attorney General within three months following original inquiry whether that government will or will not accept such alien into its territory, such designation may thereafter be disregarded. *Thereupon deportation of such alien shall be directed to any country of which such alien is a subject national, or citizen if such country is willing to accept him into its territory.* If the government of such country fails finally to advise the Attorney General or the alien within three months following the date of original inquiry, or within such other period as the Attorney General shall deem reasonable under the circumstances in a particular case, whether that government will or will not accept such alien into its territory, then such deportation shall be directed by the Attorney General within his discretion and without necessarily giving any priority or preference because of their order as herein set forth either—.
"(1) to the country from which such alien last entered the United States;
"(2) to the country in which is located the foreign port at which such alien embarked for the United States or for foreign contiguous territory;
"(3) to the country in which he was born;
"(4) to the country in which the place of his birth is situated at the time he is ordered deported;
"(5) to any country in which he resided prior to entering the country from which he entered the United States;
"(6) to the country which had sovereignty over the birthplace of the alien, at the time of his birth; or
"(7) if deportation to any of the foregoing places or countries is impracticable, inadvisable, or impossible, then to any country which is willing to accept such alien into its territory." (Emphasis supplied.)

hearing counsel, determined that there was no genuine issue as to any material fact, granted the defendant's motions, denied those of the plaintiffs, and entered judgments for the defendant as a matter of law. These appeals followed. We affirm the judgments of the District Court.

The Attorney General's findings that the appellants were natives and citizens of "China" are properly construed as findings that they were natives and citizens of the Republic of China, Dai Ming Shih v. Kennedy, 111 U.S.App. D.C. 380, 297 F.2d 791 (1961), cert. denied, 369 U.S. 844, 82 S.Ct. 876, 7 L.Ed.2d 848 (1962), and the Attorney General himself has so construed his own findings. As we pointed out in Rogers v. Cheng Fu Sheng, 108 U.S.App. D.C. 115, 280 F.2d 663, cert. denied, 364 U.S. 891, 81 S.Ct. 222, 5 L.Ed.2d 187 (1960), the United States recognizes only the Government of the Republic of China (the Nationalist Government) as the legal Government of China—a government which has its provisional capital on, and full control over, the island of Taiwan. In both the Dai Ming Shih and the Cheng Fu Sheng cases, we upheld the action of

the Attorney General in ordering deportation of deportable citizens of "China" to the Nationalist Government on the island of Taiwan, as the country of which they were subject nationals or citizens under the second priority of the statute.[3] And see United States ex rel. Leong Choy Moon v. Shaughnessy, 218 F.2d 316 (2d Cir., 1954), and United States ex rel. Tom Man v. Murff, 264 F.2d 926 (2d Cir., 1959), both of which recognize the propriety of treating Chinese citizens born on the mainland as citizens of Nationalist China, and not as citizens of Communist China, but hold that where the aliens were not acceptable to or accepted by the Nationalist Government under the second "priority" of the statute, deportation could be made only to a country willing to accept them, after inquiry, under the third part of the statute. This might, in the Attorney General's discretion, include Communist China.[4] As was said in the Man case, 264 F.2d at 928:

"Certainly if the relator is to be regarded as a 'subject national, or citizen' of Nationalist China, he may not be deported [there] because that government will not 'accept' him. *We assume that he cannot be re-*

---

**3.** Lu v. Rogers, 164 F.Supp. 320 (D.D.C.) aff'd per curiam, Rogers v. Lu, 104 U.S. App.D.C. 374, 262 F.2d 471 (1958), is not to the contrary. There the Attorney General sought to deport a "citizen of China" (born in Panama in 1925 to parents having Chinese diplomatic status) to Communist China, by delivering him to the Red Chinese border without prior inquiry as to whether he would be accepted. The record indicates that the Government regarded him as pro-Communist. No issue was raised as to whether he was a citizen of Nationalist China or of Communist China. It was held that where deportation to Communist China is undertaken, the Attorney General must comply with the statute and inquire, before deportation is attempted, of the Government of Communist China whether the deportee will be accepted. Cf. United States ex rel. Tom Man v. Murff, 264 F.2d 926 (2d Cir., 1959).

**4.** The Moon and Man decisions of course recognize that Communist China may be treated as a "country" in the Attorney

General's discretion for purposes of part three of the statute. In both cases, the Attorney General treated Communist China as a "country," but was evidently unwilling to make any inquiry of its government as to the acceptability to it of the aliens in question. Cf. Lu v. Rogers, referred to in fn. 3. Further, deportation to Communist China as the country or place of his birth under the third part of the statute was attempted in the Moon case only because the alien had previously refused to execute the documents necessary for his admission to Formosa. And this was also the situation in United States ex rel. Fong Foo v. Shaughnessy (decision by Judge Frank alone on motion to stay), 234 F.2d 715 (2d Cir., 1955), where, after his refusal to execute the papers required for entry into Formosa, the alien applied under Section 243(h) of the Act for a stay of his deportation to Communist China. As we read them, these cases cannot be interpreted as holding that citizens of China, born on the mainland but having left it, must be deemed to be nationals and

*garded as a 'subject national, or citizen' of the Communist Government, because we do not recognize that as more than a de facto government.* There remains therefore one or more of the seven subdivisions of § 243(a) of which number three certainly covers him and probably several others. * * *" (Emphasis supplied.)

See also Wong Lum v. Esperdy, 187 F. Supp. 95 (S.D.N.Y.1960); Chu Lam v. Esperdy, 209 F.Supp. 1 (S.D.N.Y.1962); and Ng Kam Fook v. Esperdy, 209 F. Supp. 637 (S.D.N.Y.1962), app. pending, all of which recognize the Nationalist Government of China on Formosa as representing the country of which persons born on the mainland of China are nationals and citizens. And see Chao-Ling Wang v. Pilliod, 285 F.2d 517 (7th Cir., 1960); Liang v. United States Department of Justice, 290 F.2d 614 (9th Cir., 1961), in which deportation to Formosa was approved, respectively, as to a former officer of the Chinese Nationalist Navy born on the mainland, and a Chinese student who entered the United States in 1949, apparently with a Nationalist Chinese passport. Cf. United States ex rel. Wong Kan Wong v. Esperdy, 197 F.Supp. 914 (S.D.N.Y.1961), and Hom Sin v. Esperdy, 209 F.Supp. 3 (S.D.N.Y. 1962), app. pending, where the aliens designated the mainland of China as the country to which they wished to be deported.

 These cases stand for the principle that nationality and citizenship for purposes of Section 243(a) are not determined exclusively by the geographical spot where one was born, but that political matters must be considered. In the case of citizens of China, for purposes of deportation from the United States, they

are properly regarded as citizens of the government of their country which the United States recognizes, at least in the absence of a showing that they in fact support and give allegiance to the government not recognized by the United States. Since effectuation of deportation to the country of which the alien is a national depends, under the statute, on securing the prior consent of that government, the statute would be deprived of effectiveness, where there are two "governments," if the Attorney General were required to secure the consent of the government not recognized by the United States. Not only are the customary diplomatic channels not available for this purpose, and the required consent virtually unobtainable, but the Attorney General would be obliged to subvert in a substantial sense the established foreign policy of the United States. And the result would be that the purpose of Congress to reduce the number of undeportables, see Rogers v. Cheng Fu Sheng, supra, would also be obstructed.

The problem here is not confined to natives of China. It has arisen before. Delany v. Moraitis, 136 F.2d 129 (4th Cir., 1943), was the case of a deportable citizen of Greece. The territory of Greece was at the time overrun and occupied by the Nazis, and the Greek Government recognized by the United States as the legal government of Greece was in exile in England. It was held proper to deport the alien to the custody of that government in England as "the country whence they [he] came" under the statute then in effect. Speaking for the Fourth Circuit, Judge Parker said in language apt here:

"It is true, of course, that the term 'country' as used in the statute must be construed, ordinarily, to refer to

citizens of the Communist Government. In fact all three cases proceed on the assumption that such Chinese citizens are not to be so regarded—in the absence, we assume, of some further showing—and that they may become deportable to Communist China only after it becomes evident that deportation to the

Nationalist Government on Taiwan cannot be effected. If the concurring opinion in Leong Leun Do v. Esperdy, 309 F. 2d 467 at 477–479 (2d Cir., 1962), intends to state a different view then we respectfully must state our disagreement with it.

the territory from which the alien came. Mensevich v. Tod, 264 U.S. 134, 136, 44 S.Ct. 282, 68 L.Ed. 591. But a man's 'country' is more than the territory in which its people live. The term is used generally to indicate the state, the organization of social life which exercises the sovereign power in behalf of the people. United States v. The Recorder, 27 Fed.Cas. page 718, 721, No. 16,129. Ordinarily the state exercises sovereignty only within the territory occupied by its people; but a different situation is presented when the territory is overrun by its enemies and its government is in exile in the territory of a friendly nation exercising power in international matters in behalf of its nationals. In such case, the government in exile has taken over the only exercise of sovereign power left to the people of the country and is the only agency representing the country with which a foreign government can deal.

"It must be remembered in this connection that the deportation of an alien is not a mere matter of taking him beyond the seas and setting him down on foreign soil. Saksagansky v. Weedin, 9 Cir., 53 F.2d 13. It must be carried out through arrangements made with the foreign government. These arrangements are matters arising in the international relationships of the nation; and these international relationships the governments in exile are thoroughly competent to deal with. They are true governments set up and organized to protect the interests of their nationals, and their powers with regard thereto are recognized and respected by the friendly nations in whose territory they function. They exercise sovereign power, moreover, not only with respect to their nationals, but also with respect to the vessels of their countries; and it has long been recognized that a vessel partakes of the character of national territory. It appears in this case that the government of the United States recognizes the Greek government functioning in England as the government of Greece and deals with it as such. In the matter of deporting an alien who has come to this country from Greece, the government must deal with the Greek government in England; and when, under agreement with that government, it arranges to return the alien into its power, it is not unreasonable to treat such delivery as a deportation to the 'country' whence he came in accordance with the statutory requirement."

▆▆ It therefore follows that the Attorney General fully complied with the statute here, see Section 243(a), fn. 2 above, by inquiring of the Government of the Republic of China whether it would accept the thirty-four deportable natives and citizens of China and, as to the thirteen which that Government stated that it would accept, in directing deportation variously to "Taiwan," "Formosa" or "The Republic of China on Formosa." As to the twenty-one whom that Government did not accept, but whom the authorities in Hong Kong agreed to take, the Attorney General properly exercised his discretion to order them deported to Hong Kong under the third part of Section 243(a), fn. 2, supra, as a country [5] willing to accept them, or as to most, if not all, of them for the reason that Hong Kong is the location of the foreign port from which they embarked for the United States, or perhaps, as to some, under others of the seven subdivisions of Section 243(a).

▆ The Attorney General's action in treating the Nationalist Government of China on Formosa as the government and

---

5. Hong Kong, a British Crown Colony, is of course a "country" for deportation purposes under Section 243(a). Ying v. Kennedy, 110 U.S.App.D.C. 247, 292 F. 2d 740, cert. denied, 368 U.S. 914, 82 S. Ct. 193, 7 L.Ed.2d 130 (1961); Chan Chuen v. Esperdy, 285 F.2d 353 (2d Cir., 1960).

country of which the appellants are natives and citizens is fully supported by the facts appearing in the certified administrative files before us as exhibits. All thirty-four were offered the opportunity to name the place where they wished to be deported, and none chose the mainland of China or Communist China. In fact, twelve indicated affirmatively that they did not choose to go there. See footnote 10, *infra,* for the preferences expressed affirmatively. Of the thirteen accepted by the Republic of China, eight were already in possession of passports issued by the Republic of China. Of the remaining five, three entered the United States as seamen on ships flying the flag of the Nationalist Government, one possessed a Hong Kong identity card, apparently the Hong Kong Seaman's Discharge Book,[6] and the file as to the remaining one shows that he testified under oath that he did not wish to be sent to Communist China. Clearly they all had voluntarily left the mainland and the jurisdiction of Red China. The Attorney General was certainly warranted in concluding on these facts alone —although other facts could be cited in support [7]—that these thirteen individuals bore allegiance to and regarded themselves as citizens of the Republic of China, rather than of Communist China. And there is nothing in the record to suggest the contrary. The unsupported allega-

tion of the complaints in the District Court that the deportable alien is "a subject, national, and citizen of the Peoples' Republic of China" was of course not before the Attorney General as to any of the thirty-four at the time he was required to determine the country of deportation under the statute.

As to the twenty-one refused entry to Taiwan (In No. 16,996), but accepted by Hong Kong, the facts disclosed by the administrative files support the action of the Attorney General in regarding them as nationals of the Republic of China on Taiwan.[8] Two of them on oath said that they were citizens of the Republic of China, nine others indicated to the Immigration and Naturalization Service that they adhered to the principles of the Government of Free China, and one more (in addition to two others) selected Formosa as the place he would like to go. Three others indicated, one of them in terms of fear for his life, that they did not want to be returned to the Chinese mainland. (Seven altogether, and possibly two others, in the group of twenty-one, indicated a desire not to return to the mainland.) A permissible, if not a necessary, inference as to these fifteen appellants is that they had elected to be and regarded themselves as citizens of Nationalist China, rather than Red China. As already indicated, they, and all the

6. The administrative file shows that Hsieh Chung San testified that he held a Hong Kong identity card, though the type of card was not further described by him. He requested that he be deported to Hong Kong if his deportation was required. However, the British Visa Office in New York City wrote that the authorities in Hong Kong were unable to accede to his entry into the Colony and requested the return of his Hong Kong Seaman's Discharge Book. He was finally ordered deported to Formosa as the territory of the country of which he was a national and citizen, under the statute, after that country had accepted him. There is nothing to suggest that he has ever *regarded or held himself out as a* citizen of Communist China.

7. Four, in addition to the one mentioned above, testified that they did not wish to

go to the Chinese mainland, and two had lived and/or had families living in Taiwan.

8. It should be noted that the Attorney General was not advised by the Chinese Consul in this country that any one of the twenty-one was denied entry to Taiwan for the reason that he was not a national or citizen of the Republic of China. When a reason was given, it was that the subject "does not possess the required entry permit for Taiwan pursuant to regulations." Quite possibly the fact that none appears to have "escaped" or gone to Taiwan and that eighteen (see footnote 9, infra) held seaman's documents issued by Hong Kong, with the right of entry there, may have been considered.

others, had escaped from or left the mainland of China.

Of the remaining six—those who did not affirmatively indicate adherence to Nationalist China and who did not affirmatively state that they did not wish to be returned to the mainland—four held Hong Kong Seaman's Identity Books, documents issued in lieu of a national passport, which permitted the holder to return to Hong Kong without a visa, either as a seaman or as a deportee from the United States; and one more held the Hong Kong Seaman's Discharge Book (but apparently not the Identity Book), a document which recorded data as to the voyages made by the holder and upon which the British Visa Offices in this country were empowered to grant, without further inquiry, an entry visa to the holder valid for his return to Hong Kong. In the absence of anything else, the conclusion is inescapable that those with Hong Kong papers [9] had escaped to or gone to Hong Kong, that they do not regard themselves as citizens of Red China, and that they do not desire to be deported there.

The remaining deportee of the twenty-one was not a seaman but came to the United States on a six months visitor's visa, which he overstayed. Although the file before us does not indicate where the visitor's visa was granted, the Attorney General could fairly assume—if he did not possess positive information—that it was obtained in Hong Kong (since Taiwan did not accept him) and therefore that he had severed himself from adherence to Red China. In any case, since a visitor's visa for the United States is something that could not be obtained in Communist China—a government with which we have no diplomatic relations—an assumption would certainly not be warranted that the holder was a citizen of Communist China or that he wished to be returned there.

■ There is no basis for any claim that appellants were not accorded due process of law. Each appellant was given an administrative hearing, with the opportunity to present evidence, before his deportation was ordered to Nationalist China or to Hong Kong. At the hearings thirty of the thirty-four were represented by counsel. The remaining four were advised that they were entitled to be represented by counsel, but indicated that the hearing should proceed without counsel. All were offered the opportunity at the hearing of naming the place or country to which they wished to be deported and, as previously indicated, none specified Communist China or the mainland of China. As shown above, the evidence before the Attorney General warranted, if it did not compel, the conclusion that the thirty-four were, and regarded themselves as, subject nationals and citizens of the Republic of China on Formosa, rather than of Red China. The order of deportation in each case is in accord with the statute, with our prior decisions and with the record facts.

■ As we have indicated earlier in this opinion, Communist China has, in a few instances and under special circumstances, been treated as a "country" for deportation purposes, and we do not hold that it may not be a "country" for such purposes. But the Attorney General here was required to determine the country of nationality and citizenship, for deportation purposes, on the record made respecting each alien before him. The District Court has reviewed and we now are reviewing, in this proceeding, the orders of deportation entered by the Attorney General on the evidence adduced before the Attorney General. As already abundantly indicated, nothing before him even

9. Of the twenty-one, a total of eleven were shown to have held the Hong Kong Seaman's Identity Book, and a total of seven who did not hold the Identity Book, were shown to have held the Hong Kong Seaman's Discharge Book. Thus, eighteen of the twenty-one were shown to have received Hong Kong Seaman's documents giving them Hong Kong entry rights and a status which can be described as that of a resident.

suggested that any of the thirty-four were in fact subject nationals or citizens of Communist China or that any wished to claim such citizenship. The Attorney General, on this record, was fully justified in treating the appellants as subject nationals or citizens of the Republic of China. And the District Court could not have reached any other conclusion. The bare allegation by the appellants in their complaints that they are citizens of Communist China is totally unsupported by the record facts, indeed it is negated by the record.

It is amply plain from the record and from counsel's statements in oral argument that plaintiffs-appellants do not desire to be deported to Communist China, and would resist any such action if it were ordered.[10] They thus are in no position to ask relief from a court of equity. Cf. Chao Chin Chen v. Murff, 168 F.Supp. 349 (S.D.N.Y.1958). The extraordinary remedies of equity are available to those who have a real grievance—not to those who are asking relief for purposes of delay, and relief which if granted they would promptly repudiate.[11] We adopt the statement made in similar circumstances in Ng Kam Fook v. Esperdy, 209 F.Supp. at 638, that:

"Plaintiff cannot subvert the purpose of section 243(a) with this 'tongue-in-cheek' contention."

The judgments of the District Court will accordingly be

Affirmed.

WRIGHT, Circuit Judge (dissenting).

As the court's opinion indicates, appellants are 34 Chinese admittedly in this country illegally. Thirteen have been ordered deported to Nationalist China (Formosa) and 21 to Hong Kong. They are here resisting deportation to these countries on the ground that they are not subject nationals or citizens thereof and that the proceedings which resulted in these deportation orders are lacking in due process.

Section 243(a)[1] of the Immigration and Nationality Act of 1952 outlines the priorities as to countries to which aliens illegally in this country shall be deported.

10. As indicated, none of the thirty-four plaintiffs said that he wished to be deported to the mainland of China, or to Red China, and twelve stated affirmatively at their hearings that they did not wish to go there. Of the twenty-one ordered deported to Hong Kong, thirteen indicated affirmatively (although perhaps not formally) a desire to be deported to places other than Red China; e. g., eight to Hong Kong, three to Formosa (entry refused), one to Sweden (entry refused) and one to Singapore (entry refused); and one more indicated affirmatively that he did not wish to go to the Chinese mainland. As to the remaining seven in this category, six held a Hong Kong Seaman's Identity Book or a Hong Kong Seaman's Discharge Book (in one case both books), four of these six had indicated an adherence to the principles of the Government of Free China, the fifth had a wife and the sixth had a wife and four children living in Hong Kong—clear indications that they had no allegiance to Red China. The seventh one is the non-seaman discussed above in the text.

Of the thirteen ordered deported to Taiwan, one indicated affirmatively that he wished to be deported to Taiwan, four indicated that they wished to be deported to Hong Kong (entry refused), and two more stated affirmatively that they did not wish to be sent to the Chinese mainland. As to the remaining six, their connections were with Taiwan—all held passports issued by the Nationalist Government, and one had gone to Taiwan in 1947, and had his family (wife, four children, and father) there.

11. Ostensibly, of course, appellants are asking only for a stay of deportation. But in fact they are asking that the Attorney General be compelled—if he wishes to continue to seek their deportation—to attempt to procure their acceptance by Communist China, something appellants emphatically do not desire. We may note that, although deportation does not appear to have been directed at the time, one of the appellants, Lu Yip in No. 16,996, applied for relief under Section 243(h) from deportation to mainland China and secured in 1956 a withholding of such deportation for an indefinite period, subject to revocation upon thirty day's notice.

1. 66 Stat. 212, 8 U.S.C. § 1253(a).

Under this section the alien is to be deported to the country designated by him, unless the Attorney General concludes that deportation to such country would be prejudicial to the interests of the United States or unless that country refuses to accept the alien. If this first priority is not satisfied, then the alien is to be deported "to any country of which such alien is a subject national, or citizen if such country is willing to accept him into its territory." If the second priority cannot be satisfied, Section 243(a) provides seven alternative countries, culminating in "any country which is willing to accept such alien," any one of which may be chosen by the Attorney General.

The aliens here did not exercise their right under the first priority to designate a country. After their deportation hearing, at which they admitted that they were natives of "China" and citizens of "China" and were so found to be, in those terms, by the Special Inquiry Officer of the Immigration Service, the Attorney General made inquiry of the Nationalist Chinese Government as to its willingness to accept appellants. The Attorney General's action was predicated on the assumption that there is only one "China" since the United States does not recognize Communist China. When Nationalist China agreed to take only 13 of the appellants, the Attorney General obtained authority from Hong Kong to deport the balance there.

It is clear that aliens are entitled to due process of law which, in deportation proceedings, means a hearing with findings supported by evidence in the record.[2] This requirement applies to the determination of the country to which an alien shall be deported under Section 243 of the Act.[3] There is little evidence [4] in

2. For a collection of the cases, see Annotation, 94 L.Ed. 329, supplemented, 96 L.Ed. 576.

3. Bellaskus v. Crossman, 335 U.S. 840, 69 S.Ct. 64, 93 L.Ed. 391 (1948), reversing 5 Cir., 164 F.2d 412 (1947); Lewis v. Frick, 233 U.S. 291, 304, 34 S.Ct. 488, 58 L.Ed. 967 (1914). See concurring opinion of Judge Lumbard in Leong Leun Do v. Esperdy, 2 Cir., 309 F.2d 467, 477 (1962).

4. I cannot agree that the record in each of these cases will support a finding that the deportee is a "subject national, or citizen" of Nationalist China. The majority relies heavily upon the fact that many of these deportees express dislike for, and fear persecution by, the Communist government. To me, this is not an acknowledgment of allegiance to the Nationalist government. I summarize briefly the other evidence in the individual cases.

*The group accepted by Formosa:* Chung King Ming, Hui Lung Liu, Sho Feng Koo, Chen Chui Yuen and Liu Tze An apparently had Nationalist Chinese passports. The passports are not in the record so we do not know if these passports are based on citizenship. Wang Siang Ken and Lok Chi Wah have families on the mainland, but sailed aboard Nationalist flag vessels. Sung Ming Fa has a family on the mainland, but had worked on Formosa, had a Nationalist Chinese passport, and had worked on Nationalist flag vessels. Kwak Hon Chi referred to the mainland as "the country of my birth, nationality and last residence," but had been a crewman on a Nationalist flag vessel. Hsin Pao Tsao has a family on the mainland, but may have had a Nationalist Chinese passport and was a crewman on a Nationalist flag vessel. Ma Tak Ling worked on Formosa for three years and had a Nationalist Chinese passport. Hsieh Chung Shan had a Hong Kong seaman's identity card and seaman's discharge book. There is no evidence as to Foo Mow Son. Only two of these deportees had ever lived on Formosa.

*The group rejected by the Nationalist government and accepted by Hong Kong:* There is no evidence connecting Liu Chung, Wong Ah Sing, Sze Chok Pan, Chang Kee Way, Leung Gar Kock, Wong Keung, Lam Cheong, or Ho Sing Chai with Nationalist China. As to Lee Wei Fang, Ip Chi Sum, Cheung Yu Cho, Au Sang, Cheun Shai Pai, Yeong Sing Loo, Lu Yip, Ho Kan, Kong Cheung Wah, and Ip For, not only is there no connection with the Nationalist government, but they have families presently living on the mainland. Yu Sai Tung testified, "My home is in the interior of China." Chung Sai Ping, who has a family on the mainland, stated, "I am a citizen of the Republic of China, being born in Kwangtung Province." This suggests that he equated citizenship with nativity. Chow Fat also stated, "I am a citizen of the Repub-

these records beyond appellants' admissions that they were born on the mainland of China and that they are citizens of "China." These admissions are the basis for the Special Inquiry Officer's finding that they are natives and citizens of "China." But there is no proof as to the "China" the appellants or the Special Inquiry Officer had in mind. Moreover, there is in the record no evidence whatever as to the municipal law of Nationalist China.[5] Consequently, we are uninformed as to whether, under the law of that country, these aliens, in particular, are subject nationals or citizens thereof, or whether, in general, Nationalist China claims as subject nationals or citizens all persons born on the mainland. Under these circumstances, it appears to me that the conclusion that these appellants are subject nationals or citizens of Nationalist China is not only without support in the record, but is likewise without support in the findings themselves.

Appellee seems to admit all this. He argues, however, that since this country does not recognize Communist China, legally there is only one China, and therefore Nationalist China must have been in the minds of the appellants when they made their admissions and in the mind of the Special Inquiry Officer when he made his findings. This "legal postulate," as appellee describes it, apparently is being advanced for the first time. Time and again, the Department of Justice has attempted to deport aliens born on the mainland to Communist China.[6] The fact that some such aliens have frustrated the attempt by invoking Section 243(h) [7] of the Act and alleging they will be subjected to physical persecution if sent to Communist China [8] cannot now justify the invocation of a "legal postulate." Most of the appellants here have indeed indicated that if they are returned to the mainland of China, they too will be persecuted. And counsel for appellants, in argument, has frankly stated that he will invoke Section 243(h) on behalf of some, if not all, of the appellants if he is successful in showing that the "China" to which they referred in their admissions was the China on the mainland, and that, consequently, under the

lic of China," without further explanation. None of this group has ever been on Formosa.

The majority cites the fact that several of the deportees had Hong Kong identity cards or seamen's discharge books. The nature of the discharge book does not appear in the record, but the Hong Kong identity card carries the printed statement: "[This card issued] without prejudice to and in no way affects the national status of the holder."

5. See Black Diamond S. S. Corp. v. Stewart & Sons, 336 U.S. 386, 396, 69 S.Ct. 622, 93 L.Ed. 754 (1949); United States ex rel. Zdunic v. Uhl, 2 Cir., 137 F.2d 858 (1943); United States ex rel. Jelic v. District Director of Immigration, etc., 2 Cir., 106 F.2d 14 (1939). Compare Dulles v. Katamoto, 9 Cir., 256 F.2d 545, 547 (1958). The omission is significant. As described supra, Note 4, and in Note 8 of the court's opinion, the Nationalist Chinese government apparently applied its own municipal law in accepting some and rejecting others of these aliens. It accepted only those deportees who had lived on Formosa, who held Nationalist Chinese passports, or who worked on Na-

tionalist Chinese vessels. Thus it appears that Nationalist China itself may not consider the Hong Kong group as its "subject national[s], or citizen[s]."

6. See, e. g., United States ex rel. Tom Man v. Murff, 2 Cir., 264 F.2d 926 (1959), noted, 28 Geo.Wash.L.Rev. 790 (1960); Rogers v. Lu, 104 U.S.App. D.C. 374, 262 F.2d 471 (1958); United States ex rel. Fong Foo v. Shaughnessy, 2 Cir., 234 F.2d 715 (1955); United States ex rel. Leong Choy Moon v. Shaughnessy, 2 Cir., 218 F.2d 316 (1954).

7. 66 Stat. 212, 8 U.S.C. § 1253(h), which reads: "The Attorney General is authorized to withhold deportation of any alien within the United States to any country in which in his opinion the alien would be subject to physical persecution and for such period of time as he deems to be necessary for such reason." See Note, 62 Yale L.J. 845 (1953).

8. See, e. g., United States ex rel. Tom Man v. Murff, supra, Note 6; United States ex rel. Fong Foo v. Shaughnessy, supra, Note 6; United States ex rel. Leong Choy Moon v. Shaughnessy, supra, Note 6.

second priority of Section 243(a) they must be deported, if at all, to Communist China.

It is clear, therefore, that the real issue around which this case centers is whether these appellants, or most of them, have a right to invoke Section 243 (h). If appellee is successful in his suggestion that "China" means Nationalist China, then, of course, these appellants will be deported to the countries indicated above, since they would not be in a position to invoke Section 243(h) as to those countries. On the other hand, if it were held that these appellants are subject nationals or citizens of Communist China,[9] Section 243(h) would become available to them.

Congress, in passing Section 243(a) of the Act, obviously intended to simplify the problem of deporting aliens, but it did not give the Executive an unrestricted hand. Under Section 243(a), since appellants indicated no preference under the first priority, in order to deport them it became necessary to determine their citizenship or nationality under the second. This has not been done, at least not in accordance with applicable standards of due process. The fact that these Chinese may be able to make a valid application under Section 243(h) to withhold deportation because of physical persecution cannot justify short-circuiting the second priority under Section 243(a). Nor, in my judgment, can their effort to assert whatever rights they may have under the Immigration and Nationality Act of 1952 preclude consideration of their application to a court of equity for enforcement of due process of law.

9. The majority holds that one cannot be a "subject national, or citizen" of Communist China because this country does not recognize that government, relying on United States ex rel. Tom Man v. Murff, supra, Note 6, 264 F.2d at 928, where Judge Learned Hand, in obvious dictum, said: "We assume that [the deportee] cannot be regarded as a 'subject national, or citizen' of the Communist Government, because we do not recognize that as more than a *de facto* government." See also Chu Lam v. Esperdy, S.D.N.Y., 209 F.Supp. 1 (1962); Ng Kam Fook v. Esperdy, S.D.N.Y., 209 F.Supp. 637 (1962).

It has been held that Communist China is a "country [which can be] designated by the alien" under the first priority, thereby compelling the Attorney General to approach Communist China as a condition to deportation. Hom Sin v. Esperdy, S.D.N.Y., 209 F.Supp. 3, 4 (1962), appeal pending. Also, Communist China may be "any country which is willing to accept such alien" under the third priority. United States ex rel. Tom Man v. Murff, supra, Note 6; United States ex rel. Leong Choy Moon v. Shaughnessy, supra, Note 6. Judge Lumbard, concurring in Leong Leun Do v. Esperdy, supra, Note 3, 309 F.2d at 477, argues that Communist China must be a "country" for all purposes.